## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EUROPLASMA, S.A.,                    )
                                     )
            Plaintiff,               )
                                     )
    v.                               )        Case No. 1:08-CV-01089 HHK
                                     )
SOLENA GROUP, INC.,                  )
                                     )
            Defendants.              )

## DEFENDANT'S MOTION TO DISMISS COMPLAINT OR,
## IN THE ALTERNATIVE, TO STAY AND TO COMPEL ARBITRATION

Defendant, Solena Group, Inc. ("Solena"), by its undersigned counsel, and pursuant to

Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure and Local Rule 7(a),

respectfully submits this motion to dismiss the Complaint filed by Plaintiff, Europlasma, S.A.

("Europlasma").  Solena asserts that this Court does not have subject matter jurisdiction and that

Europlasma's Complaint fails to state a claim upon which relief may be granted.  It should,

therefore, be dismissed.  In the alternative, Solena moves that this proceeding be stayed and that

an order be entered compelling Europlasma to submit to binding arbitration.  A supporting

statement of points and authorities, to which the Court's attention is respectfully directed, is

attached.

Respectfully submitted,

SOLENA GROUP, INC.

By:  ____/s/ James M. Mesnard_____
     Stanley S. Jutkowitz, DC Bar No. 252676
     James M. Mesnard, D.C. Bar No. 404835
     SEYFARTH SHAW LLP
     815 Connecticut Avenue, N.W., Suite 500
     Washington, DC  20006-4004
     Telephone:  (202) 463-2400
     Facsimile:  (202) 641-9233
     jmesnard@seyfarth.com

     Its Attorney

Dated:  July 18, 2008

DC1 30234648.1 / 55420-000002

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EUROPLASMA, S.A.      )
                             )
          Plaintiff,     )
                             )
      v.                  )     Case No. 1:08-CV-01089 HHK
                             )
SOLENA GROUP, INC.     )
                             )
          Defendants.    )

## DEFENDANT'S STATEMENT OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT OR,
## IN THE ALTERNATIVE, TO STAY AND TO COMPEL ARBITRATION

Defendant, Solena Group, Inc. ("Solena"), by its undersigned counsel, and pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure and Local Rule 7(a), respectfully submits this statement of points and authorities in support of its motion to dismiss the Complaint filed by Plaintiff, Europlasma, S.A. ("Europlasma"). Solena asserts that this Court does not have subject matter jurisdiction and that Europlasma's Complaint fails to state a claim upon which relief may be granted. It should, therefore, be dismissed. In the alternative, Solena moves that this proceeding be stayed and that an order be entered compelling Europlasma to submit to binding arbitration.

## STATEMENT OF FACTS

Europlasma is a French corporation with its principal place of business in Bordeaux, France (Complaint ¶1). Solena is a Delaware corporation with its principal place of business in the District of Columbia (Affidavit of Rocio Velez (Exhibit 1), ¶2). Solena is the owner of proprietary technology for the production of renewable energy from a variety of different types of biomass. Specifically, Solena is the exclusive owner of a patent for technology to treat waste streams under plasma heating conditions and convert the waste into fuel gas and inert slag

(Exhibit 1, ¶3; Exhibit 2, Page 1).  Europlasma is the owner of patented torch technology that destroys and vitrifies inorganic waste and gasifies organic waste (Exhibit 2, Page 11).

On approximately October 3, 2006, Solena placed an order to purchase a plasma torch from Europlasma (Exhibit 1, ¶5; Exhibit 3).  Solena purchased the plasma torch for use in an energy plant in Puerto Rico.  Solena paid Europlasma the shipping costs and part of the purchase price.  The outstanding balance of the purchase price is €394,517.  The remainder of the purchase price is to be paid by a grant from the Puerto Rico Industrial Development Corporation ("PRIDCO").  Europlasma was aware at the time the order was placed that the PRIDCO grant would be used to complete payment (Exhibit 1, ¶5).

The torch was shipped from Le Havre, France on February 7, 2007 (Exhibit 1, ¶6).  On May 29, 2007, Solena and Europlasma entered into the Master Teaming Agreement ("Agreement").  Solena and Europlasma agreed "to work together to develop and implement Solena Projects worldwide using Solena Technology and Europlasma Technology" (Exhibit 2, Page 2).  Solena agreed to use Europlasma as its preferred provider of torch systems.  The parties also agreed that they would "enter into a sale purchase agreement (Sale Purchase Agreement) for each Solena Project" (Exhibit 2, ¶1.2.1).  The Agreement even set out a projection of the number of torches Solena would purchase from Europlasma through 2009 (Exhibit A to Exhibit 2).  The plasma torch Solena purchased from Europlasma in October 2006 was the first of what the Agreement contemplated.

The Agreement also contains a mandatory alternative dispute resolution ("ADR") clause. Solena and Europlasma agreed that, with respect to any "controversy, claim or dispute arising out of or relating to this Agreement," the parties will negotiate in good faith to resolve the dispute.  If the parties are unable to resolve the dispute between themselves, non-binding ADR

2

procedures must be attempted (Exhibit 2, ¶6.2).  If non-binding ADR is also unsuccessful, Solena and Europlasma agreed that any dispute would be resolved by binding arbitration administered by the International Chamber of Commerce and that "judgment on the award rendered by the arbitrator(s) may be entered in the any court having jurisdiction thereof" (Exhibit 2, ¶6.3).  The ADR clause in the Agreement is clearly mandatory.

PRIDCO has not yet released the funds it committed to Solena for purchase of the torch. Solena executed a note on September 14, 2007 in which it agreed to pay the outstanding balance of the purchase price of the Europlasma torch, plus interest, on January 10, 2008 (Exhibit 1, ¶9).

Solena is in the process of other securing equity financing through Deutsche Bank AG (London) which will enable it to pay to Europlasma the outstanding balance, plus interest, of the purchase price of the torch.  In accordance with the Agreement, Solena has attempted to negotiate a forbearance agreement with Europlasma.  These negotiations have not, however, been successful (Exhibit 1, ¶¶10-11).  This dispute clearly arises out of and relates to the Agreement.  Thus, the parties are contractually obligated to proceed to non-binding arbitration. If that is not successful, the Agreement requires the parties to submit to binding arbitration. Nevertheless, Europlasma filed suit in this court on June 24, 2008.

**ARGUMENT**

**I.      EUROPLASMA'S COMPLAINT SHOULD BE DISMISSED BECAUSE THE ADR PROVISION IS ENFORCEABLE UNDER THE FEDERAL ARBITRATION ACT**

**A.      The Federal Arbitration Act Applies To The ADR Clause In Question**

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. (the "FAA"), applies to all contracts "evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction."  9 U.S.C. § 2.  The FAA's definition of commerce includes commerce with foreign nations.  9 U.S.C. § 1; *David L. Threlkeld & Co., Inc. v.*

*Metallgesellschaft Ltd., London*, 923 F.2d 245, 248 (2d Cir.), <u>cert. denied</u>, 501 U.S. 1267 (1991). The FAA manifests an emphatic federal policy in favor of arbitral resolution of disputes.  This policy "applies with special force in the field of international commerce."  *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614, 631 (1985).  Any ambiguities in the language of a contract must be interpreted in favor of arbitration.  *Ottenritter v. Shearson Lehman Hutton, Inc.*, 727 F.Supp. 980, 986 (D. Md. 1989).  The contract in question is subject to the FAA.

The ADR clause in question is mandatory.  Any controversies arising out of or relating to the Agreement must first be addressed through non-binding ADR procedures (Exhibit 2, ¶ 6.2). If, however, non-binding ADR is unsuccessful, the Agreement requires that the dispute be submitted to binding arbitration and that the arbitrators' award is enforceable in court:

> Any controversy, claim or dispute arising out of or relating to this Agreement, or the breach thereof, that the Parties can not amicably resolve under the procedures in Article 6.2, *shall be settled by arbitration* administered by the International Chamber of Commerce under its Commercial Arbitration Rules using an arbitrator that both Parties consent to in writing, and *judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*  The place of arbitration shall be London, England and the arbitrator shall determine the matters in dispute in accordance with Applicable Law.  *The Parties agree that the award of the arbitrator shall be binding and shall be the sole and exclusive remedy among them regarding claims, counterclaims, issues or accountings presented to the arbitrator.*

Exhibit 2, ¶ 6.3 (emphasis added).

The ADR provision in question applies to "[a]ny controversy, claim or dispute arising out of or relating to this Agreement. . ."  (Exhibit 2, ¶ 6.3).  The Master Teaming Agreement is an agreement between Solena and Europlasma to expend their joint efforts "to develop and implement Solena Projects worldwide using Solena Technology and Europlasma Technology" (Exhibit 2, Page 2).  This joint effort clearly encompassed the first Europlasma torch purchased

by Solena in 2006, shipped by Europlasma in 2007 and which is the subject of the note attached to Europlasma's Complaint. The note is simply one facet of an overarching agreement to develop joint projects worldwide using Solena and Europlasma technology. The fact that the Master Teaming Agreement was entered into <u>after</u> the first torch had been shipped establishes that the entire transaction is within the scope of the Master Teaming Agreement.

The sale agreement for the plasma torch and the note attached to Europlasma's complaint clearly arise out of and relate to the Master Teaming Agreement. Thus, the dispute which is the subject of Europlasma's lawsuit falls within the mandatory ADR provision. *Personal Security & Safety Systems, Inc. v. Motorola, Inc.*, 297 F.3d 388, 394 (5th Cir. 2002) (where parties include a broad arbitration provision in an agreement the court presumes that it is intended to reach all aspects of the transaction); *Wolf v. Westwood Management LLC*, 503 F.Supp. 2d 274, 280-81 (D.D.C. 2007) (dispute arising from 1971 joint venture agreement restructured into partnership agreement in 1984 subject to arbitration clause in 1971 agreement); *Consolidated Brokers Insurance Services, Inc. v. Pan America Assurance Co., Inc.*, 427 F.Supp. 2d 1074, 1080-84 (D. Kan. 2006) (compelling arbitration on two related contracts even though only one contract contained an arbitration clause). The mandatory ADR provision in the Master Teaming Agreement is clearly applicable to the issues raised by Europlasma's Complaint.

**B.      The Court Should Dismiss This Case For Lack Of Subject Matter Jurisdiction**

This Court does not have subject matter jurisdiction over the dispute between Europlasma and Solena because of the mandatory ADR procedures prescribed by the Agreement. Despite the contractual requirement that the parties participate in good faith ADR and try to reach an amicable resolution of disputes, and ultimately binding arbitration if the dispute is not resolved amicably, Europlasma never initiated any type of ADR. Rather than adhere to the terms of the

5

Agreement, Europlasma simply proceeded by filing its suit in this Court. As the plaintiff, Europlasma has the burden of proving the existence of subject matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). Europlasma has not met, and cannot meet, its burden. Accordingly, Europlasma's suit should be dismissed without prejudice on the ground that the Court lacks subject matter jurisdiction.

### C.     The Court Should Also Dismiss The Case For Failure To State A Claim Upon Which Relief Can Be Granted

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed when a plaintiff fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). Europlasma's suit fails to state a claim upon which this Court can grant relief because Europlasma's Complaint does not allege that it has complied with the mandatory ADR requirements set forth in the Agreement and that it is attempting to enforce the arbitrators' award. Courts have granted a defendant's motions to dismiss where the plaintiff failed to follow mandatory ADR provisions. *See Performance Food Group Co. v. Java Trading Co.*, 2005 WL 2456980 (E.D. Va. Oct. 5, 2005) (granting defendant's Fed. R. Civ. P. 12(b)(6) motion to dismiss because the plaintiff failed to comply with a detailed multi-step dispute resolution agreement). Europlasma has failed to comply with the contractually required dispute resolution procedures and therefore, its suit fails to state a claim upon which this Court can grant relief.

## II.     IN THE ALTERNATIVE, THIS COURT SHOULD STAY THE CASE UNTIL AN ARBITRATION AWARD HAS BEEN ENTERED

In the event that the Court chooses not to dismiss this case, the Court should at least stay the proceedings until such time as the parties have engaged in the required binding arbitration and the prevailing party is seeking to enforce the arbitrator's award. *Michelin Tire Corp. v. Todd*, 568 F.Supp. 622 (D. Md. 1983). As discussed above, the parties clearly agreed to utilize mandatory ADR to resolve any controversy, claim or dispute arising out of or relating to the

6

Agreement.  The Court should, at a minimum, stay this case pending completion of a binding arbitration.

## CONCLUSION

Europlasma's complaint should be dismissed.  In the alternative, an order should be entered compelling Europlasma to comply with the mandatory ADR provision in the Agreement and staying the case until that is accomplished.

## REQUEST FOR HEARING

Solena requests a hearing on its motion to dismiss.

Respectfully submitted,

SOLENA GROUP, INC.


By:    /s/James M. Mesnard
               Stanley S. Jutkowitz, DC Bar No. 252676
               James M. Mesnard. D.C. Bar No. 404835
               SEYFARTH SHAW LLP
               815 Connecticut Avenue, N.W., Suite 500
               Washington, DC  20006-4004
               Telephone:  (202) 463-2400
               Facsimile:  (202) 641-9233
               jmesnard@seyfarth.com

               Its Attorney

Dated:  July 18, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Plaintiff's Motion To Dismiss Or To Stay

And To Compel Arbitration was served via ECF this 18th day of July, 2008, upon the following:

        Joanne L. Zimolzak, Esq.
        Frank M. Rapoport, Esq.
        Mckenna Long & Aldridge LLP
        1900 K Street, N.W.
        Washington, DC  20006

                        /s/ James M. Mesnard
                      James Mesnard

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EUROPLASMA, S.A.                          )
                                          )
          Plaintiff,                      )
                                          )
    v.                                    )    Case No. 1:08-CV-01089 HHK
                                          )
SOLENA GROUP, INC.                        )
                                          )
          Defendants.                     )

### AFFIDAVIT OF ROCIO VELEZ

Rocio Velez, being duly sworn, and based upon personal knowledge, deposes and says:

1.      I am the General Counsel of Solena Group, Inc. ("Solena').

2.      Solena is a Delaware corporation.  Its principal place of business is Suite 626, 1900 K Street, N.W., Washington, D.C.  20006.

3.      Solena is the owner of proprietary technology for the production of renewable energy from a variety of different types of biomass.  Specifically, Solena is the exclusive owner of a patent for technology to treat waste streams under plasma heating conditions and convert the waste into fuel gas and inert slag (Master Teaming Agreement ("Agreement"), Page 1).

4.      Solena is part of a three way effort with Ana G. Mendez University System and the Puerto Rico Industrial Development Corporation ("PRIDCO") to design and construct a research and development center in Puerto Rico.  The center will employ Solena technology and plasma torch technology.

5.      On approximately October 3, 2006, Solena placed an order to purchase a plasma torch from Europlasma, S.A. ("Europlasma").  Solena paid Europlasma the shipping costs and part of the purchase price.  The outstanding balance of the purchase price is €394,517.  The remainder of the purchase price is to be funded by a grant from PRIDCO.  Europlasma was



aware at the time the order was placed that the PRIDCO grant would be used to complete payment.

6.      Europlasma shipped the torch from LeHavre, France on February 7, 2007.

7.      On May 29, 2007, Solena and Europlasma entered into the Master Teaming Agreement. Solena and Europlasma agreed "to work together to develop and implement Solena Projects worldwide using Solena Technology and Europlasma Technology" (Agreement Page 2). Solena agreed to use Europlasma as its preferred provider of torch systems. The parties also agreed that they would "enter into a sale purchase agreement (Sale Purchase Agreement) for each Solena Project" (Agreement ¶1.2.1). The Agreement even set out a projection of the number of torches Solena would purchase from Europlasma through 2009 (Exhibit A to Agreement).

8.      The plasma tourch purchased by Solena from Europlasma for the research and development center in Puerto Rico is one of the planned projects which are the subject of the Agreement.

9.      Solena executed a note on September 14, 2007 in which it agreed to pay the outstanding balance of the purchase price of the Europlasma torch, plus interest, on January 10, 2008. However, PRIDCO has not yet released the funds it committed to Solena for purchase of the torch.

10.      Solena is in the process of securing equity financing through Deutsche Bank AG (London) which will enable it to pay to Europlasma the outstanding balance, plus interest, of the purchase price of the torch.

11.      In accordance with the Agreement, Solena has attempted to negotiate a forbearance agreement with Europlasma. These negotiations have not, however, been successful.

2

I declare, under penalty of perjury, that the foregoing is true to the best of my knowledge and belief.

Rocio Velez

Subscribed and sworn to before me this _____ day of July, 2008.

Notary Public

Chang Ho Choi
Notary Public District of Columbia
My Commission Expires 6/14/09

3

# MASTER TEAMING AGREEMENT

This Agreement ("Agreement") is made effective this Tuesday, 29th of May, 2007 between

(1)    **SOLENA GROUP, INC.**, a corporation organized under the laws of the State of Delaware, U.S.A. and having its place of business at 1900 K Street, NW, Washington, DC 20006, USA, ("**Solena**"); and

(2)    **EUROPLASMA, S.A.,** a corporation organized under the laws of France, and having its place of business at 471 Route de Cantegrit Est, 40110 Morcenx, France ("**Europlasma**").

Solena and Europlasma are hereafter referred to from time to time individually as "Party" or collectively as "Parties".

## RECITALS

**WHEREAS,** Solena is the exclusive owner of the patent number 5544597 (Plasma pyrolysis and vitrification of municipal solid waste), issued on August 13, 1996 by the U.S. Patent and Trademark Office, the patent number 5634414 (Process for Plasma pyrolysis and Vitrification of municipal solid waste), issued on June 3, 1997 by the U.S. Patent and Trademark Office, the patent number 1419220 B1 (Plasma Pyrolysis, Gasification and Vitrification of organic material), issued on October 07, 2005 by the European Patent Office, and the patent number 6987792 B2 (Plasma Pyrolysis, Gasification and Vitrification of organic material) issued on January 17, 2006 by the U.S. Patent and Trademark Office(hereinafter collectively "Patents"); and other proprietary knowledge whether or not patented regarding plasma waste treatment processes for various waste streams whereby waste streams are simultaneously pyrolyzed and vitrified under plasma heating conditions into a fuel gas and an inert slag, together with its trademarked Integrated Plasma Gasification Combined Cycle ("IPGCC") (collectively referred to herein as the "Solena Technology"); and

**WHEREAS,** Europlasma owns patented plasma torch technology and has the technical and engineering resources for the manufacture of plasma torch systems ("Europlasma Plasma Heating System"), in addition to plasma melting technology for the destruction and vitrification of inorganic waste materials and apparatus for the gasification of biomass or organic waste under high temperature and input of an external energy for generating a high quality syngas (collectively "Europlasma Technology").

**WHEREAS,** SOLENA is currently developing and planning to design and build IPGCC Plants using biomass, waste or other organic sources for the production of renewable energy in countries worldwide ("Solena Projects"); and



WHEREAS, Solena and Europlasma desire to work together to develop and implement Solena Projects worldwide using Solena Technology and Europlasma Technology.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the Parties hereto agree as follows:

## 1.  SCOPE OF TEAMING

1.1  The Parties understand and agree that the principal purpose of this Agreement shall be to enable them to work together to develop and implement Projects worldwide employing Solena's Technology utilizing Europlasma's torch systems and engineering and technical support, with specific areas of cooperation including:

- o  Equipment (Plasma Heating System) Sales and Purchase

- o  Front End Engineering Design ("FEED") Support

- o  Technical Assistance Services

1.2  **Equipment Sale and Purchase**

1.2.1  Solena commits to treat Europlasma as its Preferred Provider of torch systems, and as such, Solena commits to purchase all of the plasma torch systems from Europlasma for Solena Projects utilizing Solena Technology from the date of this agreement.  Solena and Europlasma shall enter into a sale purchase agreement ("Sale Purchase Agreement") for each Solena Project. The anticipated demand of torch systems for Solena Projects is included in Exhibit "A" for indicative reference.

1.2.2  In consideration for Solena treating Europlasma as its Preferred Provider of torch systems and its commitment to purchase all torch systems from Europlasma, Europlasma will provide discounted pricing for the purchase of multiple torch systems, as shown in the attached Exhibit "A" ("Multiple Torch Sale Pricing and Scope of Supply"). It is agreed that this Agreement does not create exclusivity from Europlasma to Solena and that Europlasma is free to market and sell its products and services to any third parties, excepted when explicitly specified otherwise in the Agreement.

1.2.3  As strategic partners, both parties commit to keep confidential information regarding Solena Technology and Europlasma Vitrification Technology. Europlasma will have access to Solena Technology and commits not to use any of Solena's information in its gasification processes or research programs,

neither in the potential benefit of any other plasma torch users and / or plasma gasification supplier.

1.2.4   As a strategic customer of Europlasma, Solena will have access to Europlasma Technology and confidential proprietary information. Therefore, Solena will not provide or sell Solena Technology for projects involving melting and vitrification of inorganic wastes without fuel gas to energy recovery and production, which are in competition with Europlasma.

## 1.3   "FEED" Support

1.3.1   Once a Solena Project enters into the FEED phase, and Solena requires the support of Europlasma, Solena and Europlasma will enter into a FEED Support Services Request ("FSSR") contract for that Solena Project.

1.3.2   The expected scope of services to be requested from Europlasma during the FEED phase of a Solena Project may include, but not be limited to, the following services:

   ○   Assistance to selection and specification of the plasma torch system to be used

   ○   Assistance to optimization of the integration of the plasma torch system into the overall reactor design

   ○   Assistance to optimization of the integration of the plasma torch control system into the reactor control system

   ○   Assistance to development and optimization of the different operating modes of the plasma torch system for the specific reactor design

   ○   Practical tests on the plasma torches to determine the velocity of the plasma jet at different distances from the exit nozzle, as well temperature and pressure gradient in the plasma jet, and other operating conditions.

1.3.3   Europlasma will receive payment for the FEED Support Services. The guidelines for pricing of the FSSR are shown in Exhibit "B", Section 1.

1.3.4   For each project for which the parties sign a FSSR, Europlasma agrees to make available its resources such as design and testing facilities, engineering know-how and other resources as are necessary to develop, design or implement the Project.

1.3.5   The Parties agree that the payment for the FSSR will be deducted from the first payment corresponding to the first Sale Purchase Agreement for a torch system to be signed between Solena and Europlasma. The Parties agree that those deductions are not cumulative. One payment for one FSSR will be

- 3 -

deducted to one Sale Purchase Agreement. If there are two or more FSSR contracts, they will not be deducted to one Sale Purchase Agreement.

**1.4     Technical Assistance Services**

1.4.1   Technical Assistance Services (or "TAS") shall be defined as those technical evaluations, consulting, and other services that Europlasma shall provide to Solena when requested on a case by case basis, outside the scope of any Sales Purchase Agreement and / or FEED Support Services.

1.4.2   Solena may request TAS from Europlasma, subject to mutual agreement on the scope of the TAS, as well as written commitment from Europlasma not to provide similar engineering and technical services to any plasma gasification supplier, each time Solena considers that such TAS requires the provision of specific Confidential Information, as defined in the Reciprocal Confidentiality and Non-Compete/Non-Circumvention Agreement attached herein as Exhibit D of this Agreement, from Solena to Europlasma.

1.4.3   The general scope of assistance to be covered by Europlasma's TAS may include, but will not be limited to:

   o   Review and advice on the general design of the bottom section of the gasifier.

   o   Review and advice on the design of the slag tapping and slag exit.

   o   Advise on the optimization of the control system for the torches.

   o   Advice and recommendation of the different industrial sub-contractors and laboratories that Solena may employ for its Projects.

1.4.4   The mechanism through which Europlasma's TAS will be engaged by Solena shall follow these guidelines:

   o   Solena shall submit a request for Europlasma's Technical Assistance Services ("Request for TAS"), specifying the nature and scope of the services required.

   o   Europlasma will respond within three (3) weeks of receiving the Request for TAS, with a Preliminary Offer for its technical services, specifying the time and resources required to fulfill Solena's Request for TAS.

   o   Solena and Europlasma shall agree, within two (2) weeks of Europlasma's issue of the Preliminary Offer on the definitive scope of services and resources to be employed.

- 4 -

        o  Solena and Europlasma shall subsequently sign a TAS Order to Proceed.

1.4.5   The price and form of payment for each TAS requested and ordered shall follow the terms and conditions per resource as specified in Exhibit "B" Section 2 of this Agreement

1.4.6   For each project for which the parties sign a TAS Order to Proceed, Europlasma commits to make available its resources such as design and testing facilities, engineering know-how and other resources as are necessary to develop, design or implement the TAS.

**1.5**    This Agreement is not intended by the Parties to constitute or create a joint venture, pooling arrangement, partnership, or formal business organization of any kind. The Parties shall be independent contractors and the rights and obligations of the Parties shall only be those expressly set forth herein. Neither party shall have the authority to bind the other except to the extent authorized herein, and nothing in this Agreement shall be construed as providing for the sharing of profits or losses arising out of the efforts of either or both Parties.

## 2. SOLENA TECHNOLOGY

**2.1**    The "Solena Technology" as "SPGV Technology" referred to in this Agreement shall mean the patents and systems referred to in the first paragraph of the Recitals, all of which are patented and/or trademarked, and are exclusively licensed to and owned by Solena; and such other proprietary knowledge regarding plasma gasification processes for various organic material feedstocks, including municipal waste, whether patented, under patent application or not, whereby organic feedstocks and materials are simultaneously gasified and vitrified under proprietary plasma gasification conditions into a stable fuel gas for energy production and an inert slag-rock.

**2.2**    Europlasma acknowledges and agrees that: (i) Solena's Technology and IPGCC systems, described and referred to herein, and any improvements made thereto at anytime by Solena, Europlasma, third parties or Project Customers in the course of the development, design, engineering, construction, commissioning or operation of a Project; (ii) any and all trademarks, designs, copyrights and industrial or commercial property rights in the SPGV Technology, IPGCC systems or all other relevant Solena Technology; and (iii) any and all products, parts, covers, names, marks, emblems, labels, information and materials pertaining to the SPGV Technology, IPGCC systems and all other relevant Solena Technology, are proprietary to Solena and that nothing done under this Agreement between Europlasma and Solena or other third parties shall provide Europlasma with any proprietary interest whatsoever in SPGV Technology, IPGCC systems or all other relevant Solena Technology.

- 5 -

3. **EUROPLASMA TORCH TECHNOLOGY AND EUROPLASMA TECHNOLOGY**

3.1 The "Europlasma Torch Technology" and "Europlasma Technology" referred to in this Agreement shall mean patents and rights owned or licensed to Europlasma as listed in Exhibit "C".

3.2 Solena acknowledges and agrees that: (i) Europlasma Torch Technology and Europlasma Technology, described and referred to herein, and any improvements made thereto at anytime by Europlasma, Solena, third parties or Project Customers in the course of the development, design, engineering, construction, commissioning or operation of a Project; (ii) any and all trademarks, designs, copyrights and industrial or commercial property rights in the Europlasma Torch Technology and Europlasma Technology; and (iii) any and all products, parts, covers, names, marks, emblems, labels, information and materials pertaining to the Europlasma Torch Technology and Europlasma Technology, are proprietary to Europlasma and that nothing done under this Agreement between Solena and Europlasma or other third parties shall provide Solena with any proprietary interest whatsoever in Europlasma Torch Technology and Europlasma Technology.

4. **CONFIDENTIALITY**

4.1 In preparation for the Parties' sharing of proprietary information in accordance with the terms of this Agreement, the Parties shall execute, commensurate with this Agreement, a Reciprocal Confidentiality and Non-Compete/Non-Circumvention Agreement (the "Confidentiality Agreement"), attached hereto and incorporated herein as Exhibit "D".

4.2 The Parties will be governed by the terms and conditions of the Confidentiality Agreement and the terms and conditions set forth therein shall survive the termination of this Agreement.

5. **TERM AND TERMINATION**

5.1 This Agreement shall have a term of three (3) years from the date first above written, which term may be renewed or extended by agreement of the Parties.

5.2 Either Party may terminate this Agreement if the other Party is in default of any of its material obligations hereunder or if either Party becomes insolvent, or files a petition or reorganization, composition or compromise with its creditors under any applicable national, federal or state law. Upon the occurrence of any of the foregoing, the non-defaulting Party shall notify the other Party, in writing, of the

nature of the default and of the non-defaulting Party's intention to terminate the Agreement for default.

5.3   The non-defaulting Party may terminate this Agreement immediately if the defaulting Party becomes insolvent or files a petition for reorganization, composition or compromise with its creditors under any applicable national, federal or state law.   Termination under this Paragraph 5.3 shall be deemed effective upon the giving of notice as provided herein.

5.4   For all defaults not otherwise contained in Paragraph 5.2, the non-defaulting Party may terminate this Agreement upon the expiration of thirty (30) days from the giving of notification of default if during that time the defaulting Party (i) failed to provide reasonable evidence that such default does not in fact exist, and (ii) did not commence and diligently pursue cure of such default.

5.5   This Agreement may be terminated by the mutual, written consent of the Parties.

5.6   Termination of this Agreement will also terminate all other commercial commitments and obligations of Solena under this Agreement but shall not affect the obligations taken upon a particular Sale Purchase Agreement for Plasma Heating Systems which has been executed prior to the termination of this Agreement.

5.7   The provisions of the Confidentiality Agreement (Exhibit "D") shall survive the termination of this Agreement, as per the terms and conditions set forth therein.


6.   **APPLICABLE LAW AND RESOLUTION OF DISPUTES**

6.1   This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, United States of America, without regard to its conflict of laws, which for purposes herein shall be deemed as "Applicable Law".

6.2   If the event of a controversy, claim or dispute arising out of or relating to this Agreement, the representatives of the Parties shall meet and confer in good faith negotiations with the object of reaching mutual agreement and a settlement.   If the Parties' representatives are unable to agree, such representatives shall promptly commence discussion with respect to resolving the dispute through non-binding alternative dispute resolution ("ADR") procedures fashioned by the representative themselves or with the assistance of persons or organizations experienced in ADR procedures such as the International Chamber of Commerce.

6.3   Any controversy, claim or dispute arising out of or relating to this Agreement, or the breach thereof, that the Parties can not amicably resolve under the procedures in Article 6.2, shall be settled by arbitration administered by the International Chamber of Commerce under its Commercial Arbitration Rules using an arbitrator that both Parties consent to in writing, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.   The place of

- 7 -

arbitration shall be London, England and the arbitrator shall determine the matters in dispute in accordance with Applicable Law. The Parties agree that the award of the arbitrator shall be binding and shall be the sole and exclusive remedy among them regarding claims, counterclaims, issues or accountings presented to the arbitrator.

## 7.  INJUNCTIVE RELIEF

**7.1**  Notwithstanding any other provisions of this Agreement pertaining to the resolution of disputes, the Parties hereto agree that any breach or threatened breach of the confidentiality and non-circumvention provisions described in Paragraph 4 herein, and set forth in Exhibit "B" hereto, shall cause irreparable harm for which there is no adequate remedy at law, in damages or otherwise, as a result of which the Parties hereby consent to service of process and the issuance by any court of competent jurisdiction of an injunction, restraining the breach of such provision and the prohibited acts.  The Parties hereby agree to be bound by the decision of such a court, and hereby consent to the enforcement of any such decision.

## 8.  ASSIGNMENT

**8.1**  This Agreement shall not be assigned or otherwise transferred by either Party without the prior written approval of the other Party.

## 9.  CONSEQUENTIAL DAMAGES

**9.1**  Neither Party will be liable to the other Party for indirect or consequential damages, including but not limited to lost profit or lost business opportunity, arising out of or related to this Agreement.

## 10. ENTIRE AGREEMENT

**10.1** This Agreement constitutes the entire agreement between the Parties, relating to the subject matter hereof, and supersedes any previous agreements or understandings between them, whether oral or written.

## 11. AMENDMENTS

**11.1** No amendments or additions to this Agreement shall be binding unless such amendments or additions are in writing and signed by the Parties.

**12. NOTICES**

**12.1** Any notices provided for or required shall be given in writing and sent via air mail, transmitted by facsimile, electronic mail or personally delivered to the following:

Solena:    Dr. Robert T. Do
President and CEO
Solena Group, Inc.
1900 K Street, N.W., Suite 626
Washington, D.C.  20004
Telephone:  (+1 - 202) 682-2405
Facsimile: (+1 - 202) 682-1843
E-mail:  RTDo@SolenaGroup.com

Europlasma:   Mr. Marc Lefour
Chief Operating Officer
Europlasma, S.A.
6, rue Lajaunie
33000 Bordeaux - France
Telephone: (+33 -55) 649 7015
Facsimile: (+33 -55) 649 7019
E-mail: mlefour@europlasma.com

or to such other persons or addresses as either of the Parties shall substitute by notice to the other party as herein required, and any such notice or communication given shall be deemed given as of the date mailed or transmission sent.

IN WITNESS THEREOF, the Parties acknowledge that they are authorized to enter and have entered into this Agreement as of the date first written above.

Solena Group, Inc                    Europlasma S.A.

By: _____              By : _____
Robert Do                             Marc Lefour
President and Chief Executive Officer      Chief Operating Officer

Date: 5/25/07                        Date: 31 | 05 | 2007

- 9 -

**Exhibit "A"**
**"Multiple Torch Sale Pricing"**

ANTICIPATED TORCH SYSTEM DEMAND BY SOLENA

Most Solena IPGCC reactors include 3 torch systems with 1 spare torch body

Most Solena systems will use:
  (a) Type D: the 2 MW torch with 0.8 to 2.0 MW power supply
  (b) Type C: the 0.8 MW torch with 0.3 to 0.8 MW power supply

The following is the anticipated demand of torch systems by Solena per year. The year indicated is the year the order would be placed. Delivery time should be from 7 to 10 months average after order. Nevertheless, the estimated planning will be submitted together with the Sale Purchase Agreement and will depend on the complexity of the asked plasma system and the number of plasma torches.


2007
  - 2 systems of 0.8 MW (3 torches plus 1 spare, per system)
  - 1 system of 2 MW (3 torches plus 1 spare, per system)

2008
  - 1 system of 0.8 MW (3 torches plus 1 spare, per system)
  - 6 systems of 2 MW (3 torches plus 1 spare, per system)

2009
  - 2 systems of 0.8 MW (3 torches plus 1 spare, per system)
  - 6 systems of 2 MW (3 torches plus 1 spare, per system)


STANDARD SCOPE OF SUPPLY

EUROPLASMA supplies the following indicative scope of supply:

  - Plasma Torch;
  - Control System Unit;
  - Plasma Power Supply;
  - Hydraulic Unit;
  - Cooling Water Module;
  - Air Module;
  - Cables and Hoses (length 40 meters);
  - Accessories for Maintenance;
  - Accessories and Special Tools;
  - Standby Plasma Torch;
  - Commissioning.

- 10 -

REFERENCE PRICES:

| 1 system of 2 MW (3 torches + 1 spare) | € 3.372.000,00 |
|---|---|
| 1 system of 0,8 MW (3 torches + 1 spare) | € 2.441.000,00 |

Prices are EXW incoterm and without VAT, local tax and import duties.

| Number of system ordered during the last six months before firm order date | Discount applied on reference price |
|---|---|
| 0 | 0% |
| 1 | 5% |
| 2 | 9% |
| 3 | 12% |

Every year, the following formula will be calculated on the reference price:

$$PV_N = ((PV_{N-1} \times 20\%) \times \Delta_1) + (( PV_{N-1} \times 10\%) \times \Delta_2) + PV_{N-1}$$

Where:
- $PV_N$ = Sale price from the present year;
- $PV_{N-1}$ = Sale price from last year;
- $\Delta_1$ = Fluctuation on the copper price and on the nickel price, indicated by the EURONEXT index;
- $\Delta 2$ = Fluctuation on the engineering price indicated by the SYNTEC index.

- 11 -

**Exhibit "B"**
**PRICING GUIDELINES FOR FEED SUPPORT SERVICES**
**AND TECHNICAL ASSITANCE SERVICES**

## Section 1: FEED Support Services

A FEED Support Service will be valued at € 50.000,00. This price will be updated annually, multiplying the previous year's price by (1 + French Consumer Price Index). The reference French Consumer Price Index for each update shall be the official French Consumer Price Index for the previous year.

The price for the FEED Support Service shall be paid 30 % upon order and 70 % upon execution of the FSSR.

The total amount for the FEED Support Service shall be deducted from the price given in the subsequent Sale Purchase Agreement.

Prices are without VAT, local tax and import duties.

## Section 2: Technical Assistance Services

Price per day of Qualified Engineers: € 1.250,00.

Prices are without VAT, local tax and import duties.

Exhibit "C"
"Europlasma Technology"

| Invention n° | Publication n° | Title | COUNTRIES | |
|---|---|---|---|---|
| 89 14677 | FR 2 654 294 (pdf)<br>US 5 210 392 (pdf) | *Plasma Torch Initiated By Short Circuit* | DE, GB, NL, IT, SU, CH, ES, FR, JP, Canada, Corée, USA | |
| 87 00078 | FR 2 609 358 (pdf)<br>US 54 847 466 (pdf) | *Plasma torch having a longitudinally mobile arc root, and process for controlling the displacement thereof* | FR | |
| 95 07790 | FR 2 735 940 (pdf)<br>US 5 695 664 (pdf) | *Plasma torch with a substantially axi-symmetrical general structure* | FR, USA, Canada, Japon (en cours) | |
| 97 05921 | FR 2 763 466    -<br>US 6 00 84 64 (pdf) | *System for regulating and controlling plasma torch* | FR | |
| 98 07048 | FR 2 779 316 (pdf) | *Device for mixing cold gas at the output of a plasma torch.* | FR | |
| 87 00726 | FR 2 610 087 (pdf)<br>US 4 831 944 (pdf) | *Process and device for destroying solid waste by Pyrolysis* | FR, ES, IT, JP | |
| 98 932220.1 | WO98/58882    -<br>FR 2 764 877    -<br>US 6 532 768 (pdf) | *Method Of Rendering Inert, With The Aid Of A Plasma Torch, Products Containing Metals, In Particular Heavy Metals, And Facility For Carrying Out Said Method* | FR, DE, at, GB, IE, BE, NL, LU, IT , ES, CH, MC, US, CA, BR, TW, SG, ZA, AU, JP, Corée, USA | |
| 98 16 643 | FR2788097   (pdf) | *Furnace For Melting Solid Waste With Cooling Water Boxes* | FR, QT, JP, USA, ES | |
| 98 16 642 | FR2788121   (pdf) | *Closure Valve For Waste Gas Chamber* | FR, QT, JP, USA, ES, | |
| 98 16644 | FR2788122   (pdf) | *Furnace for fusion of solid wastes, comprises nozzle fitted to flow orifice* | FR | |
| | WO95/04004   (pdf)<br>FR 2 708 217   (pdf)<br>EP 0711 254B1 | *Method Of Rendering Inert, With The Aid Of A Plasma Torch, Products Containing Metals, In Particular Heavy Metals, And Facility For Carrying Out Said Method* | FR | |
| 05 53 128 | FR0553128 | *Apparatus for the gasification of biomass or organic waste under high temperature and* | FR | PCT en cours |

- 13 -

| | | input of an external energy for generating a high quality syngas | | |
|---|---|---|---|---|
| 06 55 217 | FR15915 | *Apparatus and Method of rendering Inert, by plasma melting hazardous materials* | **En cours de dépôt FR JP** | |

Exhibit "D"
### RECIPROCAL CONFIDENTIALITY AND
### NON-DISCLOSURE/NON-CIRCUMVENTION AGREEMENT

This Reciprocal Confidentiality and Non-Disclosure / Non-Circumvention Agreement (hereinafter "Confidentiality Agreement") is made on the 29th of May,2007 by and between Solena Group ("Solena") a Delaware Corporation, and Europlasma or "Europlasma") with its principal offices located at Morcenx, France, referred to individually as "Party", or collectively as "Parties".

WHEREAS, The Parties agree to enter into a confidential business relationship for the purpose of discussing and negotiating a more extensive business relationship.

WHEREAS, In order to achieve this purpose the Parties desire to enter into this Confidentiality Agreement.

NOW THEREFORE, In consideration for the foregoing and mutual covenants contained herein, the Parties agree:

## 1.  SCOPE OF RELATIONSHIP

1.1   The Party that receives any information ("Receiving Party") in tangible form from the Party disclosing that information ("Disclosing Party"), that is marked Confidential or Proprietary ("Confidential Information"), will consider and treat that that information as confidential. Oral information will be considered Confidential Information if it is identified as confidential by the Disclosing Party at the time of disclosure and reduced to writing and sent to the Receiving Party, under the proper notice procedures defined by this Confidentiality Agreement in Article 8, within 30 days of the disclosure.

1.2   The Receiving Party agrees to maintain all Confidential Information in the strictest confidence using at least reasonable care and except as provided by this Confidentiality Agreement, shall not use Confidential Information for its own benefit or disclose it to third parties without the written consent of the disclosing party.

1.3   Upon request from the Disclosing Party, the Receiving Party shall return within thirty (30) days all tangible materials made available or supplied by the Disclosing Party including, but not limited to, all drawings, documents, hardware, discs and tapes, without retaining any copies, notes or extracts.

1.4   Neither Party shall have any obligation under this Confidentiality Agreement with respect to information which:

A. which is now public information or which becomes public information through no fault of the Receiving Party;

- 15 -

**B.** which is properly provided to the Receiving Party without restriction by a third party, which has the legal right to do so;

**C.** which the Receiving Party can show was previously in its possession or known at the time of receipt from the Disclosing Party; or

**D.** which is developed by the Receiving Party without breach of this Confidentiality Agreement.

1.5   This Confidentiality Agreement does not obligate either Party to disclose any information to the other Party or enter into any other agreement or arrangement nor shall it be construed as granting any rights by license or otherwise in any software or inventions of either party. The Parties' agree to act in good faith in discussing and negotiating a more extensive business relationship.

1.6   The Parties agree not to circumvent each other by entering into negotiations with other identified third parties regarding specific projects disclosed during this Confidentiality Agreement for a period of at least three (3) years after the termination of this Confidentiality Agreement.

1.7   The Confidential Information that Solena shall supply to Receiving Party includes Solena Technology which is defined as patent number 5544597 (Plasma pyrolysis and vitrification of municipal solid waste), issued on  August 13, 1996 by the U.S. Patent and Trademark Office, the patent number 5634414 (Process for Plasma pyrolysis and Vitrification of municipal solid waste), issued on June 3, 1997 by the U.S. Patent and Trademark Office, the patent number 1419220 B1 (Plasma Pyrolysis, Gasification and Vitrification of organic material), issued on October 07, 2005 by the European Patent Office and the patent number 6987792 B2 (Plasma Pyrolysis, Gasification and Vitrification of organic material) issued on January 17, 2006 by the U.S. Patent and Trademark Office(hereinafter collectively "Patents"); and other proprietary knowledge whether or not patented regarding plasma waste treatment processes for various waste streams whereby waste streams are simultaneously pyrolyzed and vitrified under plasma heating conditions into a fuel gas and an inert slag, together with its trademarked Integrated Plasma Gasification Combined Cycle ("IPGCC") (collectively referred to herein as the "Solena Technology"). The Solena Technology and any and all improvements or modifications thereto is and shall remain the sole property of Solena.  Nothing contained in this Confidentiality Agreement shall, by express grant, implication, estoppel or otherwise, create in the Receiving Party any right, title, interest or license in or to Solena's inventions, patents, technical data, technical documentation or the Solena Technology.

1.8   The Confidential Information that Europlasma shall supply to Solena includes Europlasma Technology which is defined as per exhibit C; and other proprietary knowledge whether or not patented regarding plasma waste treatment processes,

- 16 -

plasma high temperature refractory and furnace knowledge, plasma torches electrodes enhancements, industrial knowledge of vitrification plants and processes, proper furnace and plasma torch coupling. The Europlasma Technology and any and all improvements or modifications thereto is and shall remain the sole property of Europlasma. Nothing contained in this Confidentiality Agreement shall, by express grant, implication, estoppel or otherwise, create in the Receiving Party any right, title, interest or license in or to Europlasma's inventions, patents, technical data, technical documentation or the Europlasma Technology.

## 2.    TERM OF CONFIDENTIALITY AGREEMENT

**2.1**  This Confidentiality Agreement is for a term of three (3) years from the date above.

**2.2**  This Confidentiality Agreement may be terminated by written mutual consent by both Parties.

**2.3**  The provisions of Article 1 shall survive any termination of this Confidentiality Agreement, except for those specific provisions where explicit term periods are provided for.

## 3.    RESOLUTION OF DISPUTES / ARBITRATION

**3.1**  All claims, disputes and other matters in question between the parties arising out of or relating to this Confidentiality Agreement or the breach thereof, shall be settled, if possible, by negotiation and mutual agreement of the Parties thereto.

**3.2**  Each Party hereto shall give notice promptly to the other of the claim, dispute or other matter in question arising out of or relating to this Confidentiality Agreement or that breach thereof. Within fifteen (15) calendar days following such notice, the Parties' representatives shall conduct good faith negotiations with the object of reaching mutual agreement. Thereafter, if the Parties are unable to agree, then each of the Parties shall document their respective position on the claim, dispute or other matter within thirty (30) calendar days and deliver to the other's representative a written presentation, setting forth in reasonable detail the Party's entitlement or relief or position thereof. Upon receipt of written presentations and within thirty (30) calendar days thereafter, the representatives of the Party shall meet and confer in good faith negotiations with the object of reaching mutual agreement and settlement.

**3.3**  If the representatives of the Parties are unable to agree, such representatives shall promptly commence discussions with respect to resolving the dispute through any non-binding alternative dispute resolution (ADR) procedure fashioned by the representatives themselves or with the assistance of persons or organizations experienced in ADR procedures, such as the International Chamber of Commerce. The location of the ADR shall be in London, England unless otherwise jointly agreed by the parties.

- 17 -

**3.4**  If the Parties are unable to agree on an ADR procedure to be used, the claim, dispute or other matter in question between the parties, arising out of or relating to the Confidentiality Agreement, shall be decided by a court of competent jurisdiction in the State of Delaware, USA.

**3.5**  Regardless of the legal remedies available to the injured Party, the breaching party acknowledges that the injured party has suffered irreparable harm and is entitled to injunctive relief preventing further injury. This injunctive relief does not limit any other legal remedies available to the injured party.

## 4.  GOVERNING LAW

**4.1**  This Confidentiality Agreement shall be interpreted under and governed by the laws of the State of Delaware, USA.

## 5.  ENFORCEABILITY

**5.1**  In the event any provision of this Confidentiality Agreement is found to be unenforceable or invalid, such provision shall be severable from this Confidentiality Agreement if it is capable of being identified with and apportioned or reciprocal consideration or to the extent that it is a provision which is not essential in the absence of which would not have prevented the Parties from entering into this Confidentiality Agreement. The unenforceability or invalidity of a provision which has been performed shall not be grounds for invalidation of the Confidentiality Agreement under circumstances in which the true controversy between the parties does not involve such provision.

## 6.  AMENDMENTS

**6.1**  No amendments or additions to this Confidentiality Agreement shall be binding unless such amendments or additions are in writing and signed by the Parties.

## 7.  HEADINGS

**7.1**  The paragraph and section headings in this Confidentiality Agreement are included solely for convenience and shall not affect, or be used to in connection with, the interpretation of this Confidentiality Agreement.

## 8.  NOTICES

**8.1**  Any notices provided for or required shall be given in writing by either prepaid first class mail or certified mail, return receipt requested to the following:

- 18 -

Solena Group, Inc.
ATTN: Dr. Robert T. Do, President and CEO
1900 K Street, N.W.
Suite 626
Washington, D.C. 20004
United States of America
Tel: (+1 - 202) 682-2405
Fax:(+1 - 202) 682-1843


Europlasma, S.A.
ATTN: Marc Lefour, COO
6, rue Lajaunie
33100 Bordeaux - France
Tel: (+33 -55) 649 7015
Fax: (+33 -55) 649 7019


or to such other persons or addresses as either of the Parties shall substitute by notice given as herein required, and any such notice or communication shall be deemed given as of the date mailed.

In witness whereof, the parties have executed this Confidentiality Agreement as of the date first written above.

SIGNED by: Dr. Robert T. Do
Title: President and CEO
Solena Group, Inc.

Signed _____

SIGNED by: Marc Lefour
Title: Chief Operating Officer
Europlasma, S.A.

Signed: _____

- 19 -



Madrid/Washington, October 3rd, 2006

EUROPLASMA
6 Rue Lajaunie
33100 BORDEAUX – France

**Subject**: Your proposal 06-016

### ORDER n°103 dated October 3rd, 2006

Dear Sir,

We are pleased to confirm the present order for 1x300kW Non transferred Plasma Torch as per your proposal 06-016 dated September 15, 2006.

We herewith confirm the payment terms and conditions as per our conversation in your offices on September 28th, 2006, i.e. :

Total amount of the order: Euros 530,000, without consumables and Commissioning.

- 10% upon order. You already received Euros 47,000; a complementary payment of Euros 6,000 (Euros six thousand) will be made along this week.
- 30%, 60 days after the torches arrives in Puerto Rico as per the bill of lading.
- 40%, 60 days after the platform (torch system) is FOB ready for shipment.
- 20% upon acceptance and no more than 90 days after the equipment arrived in Puerto Rico as per the bill of lading.

Payment of Consumables (€5,465) and Commissioning (€ 25,000) will be paid after Commissioning and no more than 90 days after the equipment arrived in Puerto Rico as per the bill of lading.

We expect the shipment of the torch in the shortest possible time. Please confirm the FOB date.

Looking forward,

Yves Bannel
On behalf of Solena Group

c/ Almirante n°6-2D – 28004 MADRID – Spain
T.(+34) 91 7010740 – ybgps a hotmail.com



EXHIBIT
3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EUROPLASMA, S.A.,      )
                        )
        Plaintiff,    )
                        )
        v.            )     Case No. 1:08-CV-01089 HHK
                        )
SOLENA GROUP, INC.,    )
                        )
        Defendants.   )

Order

Upon consideration of the motion to dismiss submitted by Defendant Solena Group, Inc.

and the supporting and opposing statements of points and authorities, it is hereby ordered, this

____ day of _____, 2008 that Defendant's Motion is GRANTED and Plaintiff's

Complaint is DISMISSED with prejudice.

                _____
                Henry H. Kennedy
                United States District Judge