## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUROPLASMA, S.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:08-CV-01089 HHK |
| | ) |
| SOLENA GROUP, INC., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
COMPLAINT OR, IN THE ALTERNATIVE, TO STAY AND TO COMPEL
ARBITRATION AND STATEMENT OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Solena Group, Inc. ("Solena"), by its undersigned counsel, and pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure and Local Rule 7(b), respectfully submits

this consolidated reply in support of its motion to dismiss the Complaint filed by Plaintiff,

Europlasma, S.A. ("Europlasma") and statements of points and authorities in opposition to

Europlasma's motion for summary judgment. Solena asserts that this Court does not have

subject matter jurisdiction and that Europlasma's Complaint fails to state a claim upon which

relief may be granted because Europlasma as not complied with a mandatory ADR provision.

The Complaint, therefore, should be dismissed. In the alternative, Solena moves that this

proceeding be stayed and that an order be entered compelling Europlasma to submit to binding

arbitration.

Solena asserts also that Europlasma's motion for summary judgment should be denied

and the parties should proceed with discovery. Alternatively, a ruling on Europlasma's motion

for summary judgment should be continued pursuant to Rule 56(f) to allow Solena to conduct

discovery on the issue of whether the current dispute between Solena and Europlasma is subject

to mandatory, binding arbitration. A statement of material facts which Solena contends are genuinely in dispute, to which the Court's attention is respectfully directed, is attached.

## BACKGROUND

This action arises out of the business relationship between Solena and Europlasma. Solena is the exclusive owner of a patent for technology to treat waste streams under plasma heating conditions and convert the waste into fuel gas and inert slag (Affidavit of Rocio Velez ("Velez Affidavit"), ¶3). Europlasma is the owner of patented torch technology that destroys and vitrifies inorganic waste and gasifies organic waste (Affidavit of Rocio Velez ("Velez Affidavit") ¶3. On approximately October 3, 2006, Solena placed an order to purchase a plasma torch from Europlasma. Solena purchased the plasma torch for use in an energy plant in Puerto Rico. Solena paid Europlasma the shipping costs and part of the purchase price. The outstanding balance of the purchase price is €394,517. The remainder of the purchase price is to be paid by a grant from the Puerto Rico Industrial Development Corporation ("PRIDCO"). Europlasma was aware at the time the order was placed that the PRIDCO grant would be used to complete payment (Velez Affidavit, ¶¶4-5).

Solena and Europlasma entered into a Master Teaming Agreement on May 29, 2007. Solena and Europlasma agreed "to work together to develop and implement Solena Projects worldwide using Solena Technology and Europlasma Technology" (Velez Affidavit, ¶5; Exhibit 1 to Velez Affidavit ("Agreement") Page 2). Solena agreed to use Europlasma as its preferred provider of torch systems. The parties also agreed that they would "enter into a sale purchase agreement ('Sale Purchase Agreement') for each Solena Project" (Agreement ¶1.2.1). The Agreement even set out a projection of the number of torches Solena would purchase from Europlasma through 2009 (Exhibit A to Agreement). The Agreement clearly governs the business relationship between Solena and Europlasma.

2

The Agreement contains a mandatory alternative dispute resolution ("ADR") clause. The clause provides that the parties will attempt to negotiate a resolution of any "controversy, claim or dispute arising out of or relating to this Agreement," the parties will negotiate in good faith to resolve the dispute. If the parties are unable to resolve the dispute between themselves, non-binding alternative dispute resolution procedures must be attempted (Agreement ¶6.2). If non-binding ADR is also unsuccessful, Solena and Europlasma agreed that any dispute relating to the Agreement would be resolved by binding arbitration administered by the International Chamber of Commerce and that "judgment on the award rendered by the arbitrator(s) may be entered in the any court having jurisdiction thereof" (Agreement ¶6.3). The ADR clause is clearly mandatory. It has always been Solena's intent and understanding that the Agreement applies to all aspects of the business relationship between Solena and Europlasma (Velez Affidavit, ¶8).

PRIDCO has not yet released the funds it committed to Solena for purchase of the torch. Solena executed a note on September 14, 2007 ("Note") in which it agreed to pay the outstanding balance of the purchase price of the Europlasma torch, plus interest, on January 10, 2008. Solena is in the process of other securing equity financing through Deutsche Bank AG (London) which will enable it to pay to Europlasma the outstanding balance, plus interest, of the purchase price of the torch. Solena has attempted to negotiate a forbearance agreement with Europlasma. These negotiations have not, however, been successful (Velez Affidavit, ¶¶11-13).

This dispute clearly arises out of and relates to the Agreement. Accordingly, the parties are contractually obligated to proceed to non-binding arbitration. If that is not successful, the Agreement requires the parties to submit to binding arbitration. Instead, Europlasma filed suit in this Court on June 24, 2008.

On July 18, 2008, Solena moved to dismiss Europlasma's Complaint on the grounds that it fails to state a claim upon which relief may be granted. Specifically, Solena asserts that this Court does not have subject matter jurisdiction because the parties have not exhausted the mandatory ADR procedures in the Agreement. Alternatively, Solena moved the Court to stay the proceeding and to direct the parties to engage in the required ADR.

Europlasma responded on August 5, 2008. Europlasma asserts that Solena's motion to dismiss should be denied. Europlasma also moves that it be granted summary judgment on the September 14, 2007 Note. Europlasma claims that the current dispute concerning the Note has no relationship whatsoever to the Agreement. In other words, Europlasma asserts that the Note is not in any way related to the business relationship between Solena and Europlasma.

The only evidence Europlasma submits in support of its summary judgment motion is an Affidavit from one of Europlasma's outside counsel attempting to authenticate three letters and an e-mail all generated in early 2008 and to support a claim for attorneys' fees. Solena asserts that Europlasma's motion for summary judgment should be denied. Even if Solena's motion to dismiss or to say is denied, disputed issues of material fact exist as to whether the Agreement requires that the issues raised by Europlasma's summary judgment motion are subject to the binding arbitration provision in the Agreement.

I.     **SOLENA'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY AN TO COMPEL ARBITRATION SHOULD BE GRANTED**

   A.     **The Current Dispute Concerning The Note Relates To The Master Teaming Agreement**

The Master Teaming Agreement the parties entered into on May 29, 2007 governs the business relationship between Solena and Europlasma, including the Note which is the subject of Europlasma's Complaint. The stated purpose of the Agreement is to establish the parameters by

DC1 30237118.1 / 55420-000002

which the parties would "work together to develop and implement Solena Projects worldwide

using Solena technology and Europlasma Technology (Agreement, Page 2).

The Agreement sets out a projection of the number of torches Solena would purchase

from Europlasma through 2009 (Exhibit A to Agreement).  However, the Agreement does not

apply only to the number and types of torches identified in the *projection*.  If Solena purchases

additional Europlasma torches beyond those in the projection the additional torches purchases

will also be subject to the Agreement.  The torch purchased in 2006 falls within the scope of the

Agreement because that initial purchase is a component of the relationship established by the

Agreement.  Similarly, the Note executed in  September 2007 is also governed by the Agreement

because it also relates to the business relationship between Solena and Europlasma.

**B.**     **Disputes Relating To The Agreement Are Subject To Mandatory ADR,**
        **Including Binding Arbitration**

The Agreement requires non-binding ADR, followed by binding arbitration, of any

controversy arising out of or relating to the Agreement:

>    6.2  If the event of a controversy, claim or dispute *arising out of or*
>         *relating* to this Agreement, the representatives of the Parties
>         shall meet and confer in good faith negotiations with the
>         object of reaching mutual agreement and a settlement.  If the
>         Parties' representatives are unable to agree, such
>         representatives shall promptly commence discussion with
>         respect to resolving the dispute through non-binding
>         alternative dispute resolution ("ADR") procedures fashioned
>         by the representative themselves or with the assistance of
>         persons or organizations experienced in ADR procedures such
>         as the International Chamber of Commerce.
>
>    6.3  Any controversy, claim or dispute *arising out of or relating* to
>         this Agreement, or the breach  thereof, that the Parties can not
>         amicably resolve under the procedures in Article 6.2, shall be
>         settled by arbitration administered by the International
>         Chamber of Commerce under its Commercial Arbitration
>         Rules using an arbitrator that both Parties consent to in
>         writing, and judgment on the award rendered by the
>         arbitrator(s) may be entered in any court having jurisdiction

> thereof. The place of arbitration shall be London, England and
> the arbitrator shall determine the matters in dispute in
> accordance with Applicable Law. The Parties agree that the
> award of the arbitrator shall be binding and shall be the sole
> and exclusive remedy among them regarding claims,
> counterclaims, issues or accounts presented to the arbitrator.

Agreement, ¶¶ 6.2, 6.3 (emphasis added).

This provision is clear and unequivocal. The current dispute arises from Solena's and

Europlasma's efforts to develop and implement projects worldwide. Thus, the current dispute

relates to the Agreement because it relates to the stated purpose of the Agreement. Accordingly,

the ADR procedures established by the Agreement apply to the current dispute.

### C.    The Documents Submitted By Europlasma Confirm That The Current Dispute Relates To The Agreement

Europlasma asserts that the Agreement is inapplicable to the current dispute because the

torch in question is not identified in the projection of the number and type of torches to be

purchased through 2009. This argument is nonsensical. The *projection* attached to the

Agreement is a *projection*. There was no need to project that a torch which had already been

purchased would be purchased. The Agreement applies to the torch purchased in 2006 as well as

torches to be purchased in the future. Similarly, the Agreement applies to torches purchased in

the future regardless if they are identified in the projection.

An examination of other aspects of the Agreement confirms that it governs the entire

business relationship between Solena and Europlasma. For example, the Agreement contains a

confidentiality provision requiring the parties to execute a confidentiality agreement (Agreement,

¶4; Exhibit D to the Agreement). There can be do dispute that the confidentiality agreement

applies to the entire business relationship between Solena and Europlasma. The confidentiality

agreement requires Solena and Europlasma to maintain the confidentiality of proprietary

information shared between them during the term of their relationship. If Europlasma's assertion

6

in this dispute were correct, neither party would be bound by the confidentiality provision with respect to the torch purchased in 2006. Such a result makes no sense and is inconsistent with the stated purpose of the Agreement.

Europlasma asserts that the Note does not contain a mandatory ADR provision, and therefore, Solena's motion should be denied. However, the Agreement governing the relationship between Solena and Europlasma does contain a mandatory ADR provision. The Agreement governs the business relationship between Solena and, therefore, the mandatory ADR provision also governs the Note.

The documents submitted by Europlasma in support of its motion for summary judgment highlight the fact that the torched purchased in 2006 and the Note executed in 2007 relate to the Agreement and are subject to the Agreement and its mandatory ADR procedure. The February 14, 2008 e-mail from Europlasma to Solena stated that, because of the dispute, Europlasma "shall not be allowed to trade" with Solena until the dispute is resolved (Exhibit B to Affidavit of Joanne L. Zimolzak). The March 13, 2008 letter of from Andre-Jean Goimand of Europlasma expressed to Solena's "deepest desire to continue working in partnership with Europlasma" (Exhibit C to Affidavit of Joanne L. Zimolzak). These communications clearly relate to the Agreement. Thus, the communications show that the Agreement governs the entire business relationship between Solena and Europlasma.

The current dispute concerning Solena's purchase of the 2006 torch and the Note clearly arises out of or relates to the Master Teaming Agreement. Thus, the current dispute is subject to the mandatory ADR provision in the Agreement and Solena's motion to dismiss or, in the alternative, to stay and to compel arbitration should be granted.

## II.    EUROPLASMA'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

### A.    Summary Judgment May Not Be Granted If There Is A Disputed Issue Of Material Fact

It is axiomatic that summary judgment is only appropriate when there is no genuine issue of disputed material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(e).  Summary judgment is only appropriate if the evidence presented is "so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-42 (1986).  There is no such evidence here.

### B.    Europlasma's Evidence Establishes That There Are Disputed Issues of Material Fact

The only evidence submitted by Europlasma in support of its motion for summary judgment are a February 14, 2008 e-mail from Europlasma to Solena (Exhibit B to Affidavit of Joanne L. Zimolzak), a March 13, 2008 letter from Solena to Europlasma (Exhibit C to Affidavit of Joanne L. Zimolzak), an April 3, 2008 letter from Europlasma to Solena (Exhibit D to Affidavit of Joanne L. Zimolzak) and two letters between counsel (Exhibits E and F to Affidavit of Joanne L. Zimolzak).  This evidence clearly shows that issues arising from the purchase of the torch in 2006 and the 2007 Note relate to the Agreement.  Thus, the issues arising from the 2006 purchase and the 2007 Note are subject to the mandatory ADR provision in the Agreement.

Again, the February 14, 2008 e-mail from Europlasma to Solena stated that, because of the dispute, Europlasma "shall not be allowed to trade" with Solena until the dispute is resolved (Exhibit B to Affidavit of Joanne L. Zimolzak).  The March 13, 2008 letter from Yves Barrel of Solena to Andre-Jean Goimand of Europlasma expressed Solena's "deepest desire to continue working in partnership with Europlasma" (Exhibit C to Affidavit of Joanne L. Zimolzak).  Solena asserts that this evidence establishes that the current dispute relates to the Agreement and,

therefore, that it is subject to the Agreement's mandatory ADR provision. Thus, Solena's

motion to dismiss should be granted. At a minimum, however, the evidence submitted by

Europlasma establishes the existence of a disputed issue of material fact as whether the

mandatory ADR provision applies to this dispute. Europlasma's motion for summary judgment

should, therefore, be denied.

**C.    Alternatively, Europlasma's Motion For Summary Judgment Should Be Denied Or Continued Pursuant To Rule 56(f) To Allow Solena To Conduct Discovery**

Rule 56(f) provides that the Court may deny or defer ruling on a motion for summary

judgment so that the non-moving party may conduct discovery in order to establish that a

genuine issue of material fact exists. Fed. R. Civ. P. 56(f); *Exxon Corp. v. Federal Trade

Commission*, 663 F.2d 120, 126-27 (D.C. Cir. 1980). The requirements of Rule 56(f) should be

liberally construed so that the non-moving parties will have a reasonable opportunity to establish

the existence of genuine issues of disputed material facts. *Black v. National Football League

Players Assoc.*, 87 F.Supp.2d 1, 4 (D.D.C. 2000).

In this action, Solena has not answered Europlasma's Complaint and it has not had an

opportunity to conduct *any* discovery. This fact by itself establishes that Europlasma's summary

judgment motion should be denied or deferred to provide Solena with an opportunity to conduct

discovery.

The central issue before the Court with respect to the parties' competing motions is

whether Solena's purchase of a Europlasma torch in 2006 and the Note relate to the Master

Teaming Agreement. Europlasma asserts that there is no disputed issue of material fact.

However, the documents it relies on in support of its assertions clearly show that the initial

purchase in 2006 of Europlasma's torch and the Note relate to and arise out of the Agreement.

9

They relate to and arise out of the business relationship memorialized by the Agreement. Europlasma's February 14, 2008 e-mail confirms this to be the case.

Solena is entitled to conduct discovery, including interrogatories and requests for production of documents, asking for the identity of individuals within Europlasma with knowledge of Europlasma's goals in entering the Agreement in 2007 and these individuals' understanding of the scope and intent of the Agreement. Solena is also entitled to discover Europlasma's internal and external written, electronic and oral communications concerning the Agreement. Solena should be permitted to depose individuals identified with knowledge of these subjects, including Andre-Jean Goimand, the author of the February 14, 2008 e-mail (Affidavit of James M. Mesnard).

Moreover, Solena should be permitted an opportunity to conduct discovery concerning Europlasma's allegations that it is entitled to recover $40,198.35 in attorneys' fees and costs. The Note only provides for recovery of reasonable attorneys' fees. The bills attached to Ms. Zimolzak's Affidavit are not reasonable. In particular, time charges of $625 per hour for the time expended by Frank M. Rapoport for what Europlasma now asserts is a simple collections action is excessive.

**D.  Europlasma Has Failed To Prove That It Is Entitled To Recover $40,198.35 in Attorneys' Fees And Costs**

One of the elements of damages alleged by Europlasma is attorneys' fees and costs. Even if Solena's motion to dismiss and/or to stay and its motion for discovery pursuant to Rule 56(f) are denied, and even if the Court grants Europlasma's motion for summary judgment, Europlasma's request that it be awarded $40,198.35 in attorneys' fees and costs should be denied.

10

Both the Agreement and the Note state that they will be interpreted pursuant to Delaware Law. That does not, however, extend to procedural matters such as the criteria for determining the reasonableness of awards of attorneys' fees. In *Hensley v. Eckhart*, 461 U.S. 424 (1983), the Supreme Court clearly stated that attorneys seeking court awarded attorneys fees must exercise billing judgment:

> [T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates. The applicant should exercise "billing judgment" with respect to hours worked, see *supra*, at 1939-1940, and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.

461 U.S. at 437 (footnote omitted).

Solena asserts that Ms. Zimolzak's conclusory affidavit is not sufficient to establish that the hourly rates claimed, especially $625 per hour for Mr. Rapoport's time, are the prevailing rate for what Europlasma characterizes as a simple collections action. Solena also asserts that many of the time charges are excessive. For example, a total of 8.9 hours were expended between June 12, 2008 and June 17, 2008 exploring litigation options, whatever that means, and drafting litigation strategies and budgets for what Europlasma now attempts to portray as an open and shut collections action.

Similarly, a time charge of 2.4 hours on June 19, 2008 for researching requirements for commencing an action in this court is grossly excessive. A total of 13.0 hours were expended between June 20, 2008 and June 24, 2008 for tasks associated with drafting a three and one-half page complaint. Solena asserts that this is an excessive amount of time.

In sum, Europlasma has failed to make the evidentiary showing necessary to prove that it is entitled to an award of reasonable attorneys' fees. Its request for an award of attorneys' fees should, therefore, be denied.

11

## CONCLUSION

Solena's motion to dismiss the Complaint should be granted and Europlasma's motion for summary judgment should be denied.

Respectfully submitted,

SOLENA GROUP, INC.

By:    /s/James M. Mesnard
        Stanley S. Jutkowitz, DC Bar No. 252676
        James M. Mesnard. D.C. Bar No. 404835
        SEYFARTH SHAW LLP
        815 Connecticut Avenue, N.W., Suite 500
        Washington, DC  20006-4004
        Telephone:  (202) 463-2400
        Facsimile:  (202) 641-9233
        jmesnard@seyfarth.com

        Its Attorney

Dated:  August 26, 2008

DC1 30237118.1 / 55420-000002

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Reply In Support Of Its Motion To Dismiss

Complaint Or, In The Alternative, To Stay And To Compel Arbitration And Statement Of Points

And Authorities In Opposition to Plaintiff's Motion For Summary Judgment was served via ECF

this 26th day of August, 2008, upon the following:

> Joanne L. Zimolzak, Esq.
> Frank M. Rapoport, Esq.
> Mckenna Long & Aldridge LLP
> 1900 K Street, N.W.
> Washington, DC  20006


> ___/s/ James M. Mesnard_____
> James Mesnard

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EUROPLASMA, S.A.,                          )
                                           )
              Plaintiff,                    )
                                           )
       v.                                  )    Case No. 1:08-CV-01089 HHK
                                           )
SOLENA GROUP, INC.,                        )
                                           )
              Defendants.                   )

## AFFIDAVIT OF ROCIO VELEZ

Rocio Velez, being duly sworn, and based upon personal knowledge, deposes and says:

1.    I am the General Counsel of Solena Group, Inc. ("Solena"). I am also Solena's Vice President Business Development.

2.    Solena is a Delaware corporation. Its principal place of business is Suite 626, 1900 K Street, N.W., Washington, D.C. 20006.

3.    Solena is the owner of proprietary technology for the production of renewable energy from a variety of different types of biomass. Specifically, Solena is the exclusive owner of a patent for technology to treat waste streams under plasma heating conditions and convert the waste into fuel gas and inert slag.

4.    Solena is part of a three way effort with Ana G. Mendez University System and the Puerto Rico Industrial Development Corporation ("PRIDCO") to design and construct a research and development center in Puerto Rico. The center will employ Solena technology and plasma torch technology.

5.    On approximately October 3, 2006, Solena placed an order to purchase a plasma torch from Europlasma, S.A. ("Europlasma"). Solena paid Europlasma the shipping costs and part of the purchase price. The outstanding balance of the purchase price is €394,517. The

remainder of the purchase price is to be funded by a grant from PRIDCO. Europlasma was

aware at the time the order was placed that the PRIDCO grant would be used to complete

payment.

6.     Europlasma shipped the torch from LeHavre, France on February 7, 2007.

7.     On May 29, 2007, Solena and Europlasma entered into the Master Teaming

Agreement. Solena and Europlasma agreed "to work together to develop and implement Solena

Projects worldwide using Solena Technology and Europlasma Technology" (Exhibit 1, Page 2).

Solena agreed to use Europlasma as its preferred provider of torch systems. The parties also

agreed that they would "enter into a sale purchase agreement (Sale Purchase Agreement) for

each Solena Project" (Exhibit 1, ¶1.2.1). The Agreement even set out a projection of the number

of torches Solena would purchase from Europlasma through 2009 (Exhibit A to Agreement).

8.     The Agreement also contains a mandatory arbitration clause that applies to any

controversy or dispute arising out of or relating to the Agreement. It was Solena's intent and

understanding in entering into the Agreement that the Agreement would apply to all aspects of

the relationship between Solena and Europlasma.

9.     A copy of the Agreement is attached as Exhibit 1. It is a true and accurate copy

of the Agreement that is maintained in Solena's files and in the ordinary course of Solena's

business.

10.     The plasma torch purchased by Solena from Europlasma for the research and

development center in Puerto Rico is one of the planned projects which are the subject of the

Agreement.

11.     Solena executed a note on September 14, 2007 in which it agreed to pay the

outstanding balance of the purchase price of the Europlasma torch, plus interest, on January 10,

2

2008. However, PRIDCO has not yet released the funds it committed to Solena for purchase of the torch.

12.    Solena is in the process of securing equity financing through Deutsche Bank AG (London) which will enable it to pay to Europlasma the outstanding balance, plus interest, of the purchase price of the torch.

13.    In accordance with the Agreement, Solena has attempted to negotiate a forbearance agreement with Europlasma. These negotiations have not, however, been successful.

I declare, under penalty of perjury, that the foregoing is true to the best of my knowledge and belief.

Rocio Velez

Subscribed and sworn to before me this 26th day of August, 2008.

Notary Public

My Commission Expires 5/14/2012

3

# MASTER TEAMING AGREEMENT

This Agreement ("Agreement") is made effective this Tuesday, 29th of May, 2007 between

(1)  **SOLENA GROUP, INC.**, a corporation organized under the laws of the State of Delaware, U.S.A. and having its place of business at 1900 K Street, NW, Washington, DC 20006, USA, ("**Solena**"); and

(2)  **EUROPLASMA, S.A.**, a corporation organized under the laws of France, and having its place of business at 471 Route de Cantegrit Est, 40110 Morcenx, France ("**Europlasma**").

Solena and Europlasma are hereafter referred to from time to time individually as "Party" or collectively as "Parties".

## RECITALS

**WHEREAS**, Solena is the exclusive owner of the patent number 5544597 (Plasma pyrolysis and vitrification of municipal solid waste), issued on August 13, 1996 by the U.S. Patent and Trademark Office, the patent number 5634414 (Process for Plasma pyrolysis and Vitrification of municipal solid waste), issued on June 3, 1997 by the U.S. Patent and Trademark Office, the patent number 1419220 B1 (Plasma Pyrolysis, Gasification and Vitrification of organic material), issued on October 07, 2005 by the European Patent Office, and the patent number 6987792 B2 (Plasma Pyrolysis, Gasification and Vitrification of organic material) issued on January 17, 2006 by the U.S. Patent and Trademark Office(hereinafter collectively "Patents"); and other proprietary knowledge whether or not patented regarding plasma waste treatment processes for various waste streams whereby waste streams are simultaneously pyrolyzed and vitrified under plasma heating conditions into a fuel gas and an inert slag, together with its trademarked Integrated Plasma Gasification Combined Cycle ("IPGCC") (collectively referred to herein as the "Solena Technology"); and

**WHEREAS**, Europlasma owns patented plasma torch technology and has the technical and engineering resources for the manufacture of plasma torch systems ("Europlasma Plasma Heating System"), in addition to plasma melting technology for the destruction and vitrification of inorganic waste materials and apparatus for the gasification of biomass or organic waste under high temperature and input of an external energy for generating a high quality syngas (collectively "Europlasma Technology").

**WHEREAS**, SOLENA is currently developing and planning to design and build IPGCC Plants using biomass, waste or other organic sources for the production of renewable energy in countries worldwide ("Solena Projects"); and



WHEREAS, Solena and Europlasma desire to work together to develop and implement Solena Projects worldwide using Solena Technology and Europlasma Technology.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the Parties hereto agree as follows:

## 1.  SCOPE OF TEAMING

1.1   The Parties understand and agree that the principal purpose of this Agreement shall be to enable them to work together to develop and implement Projects worldwide employing Solena's Technology utilizing Europlasma's torch systems and engineering and technical support, with specific areas of cooperation including:

- Equipment (Plasma Heating System) Sales and Purchase

- Front End Engineering Design ("FEED") Support

- Technical Assistance Services

1.2   **Equipment Sale and Purchase**

1.2.1   Solena commits to treat Europlasma as its Preferred Provider of torch systems, and as such, Solena commits to purchase all of the plasma torch systems from Europlasma for Solena Projects utilizing Solena Technology from the date of this agreement.  Solena and Europlasma shall enter into a sale purchase agreement ("Sale Purchase Agreement") for each Solena Project. The anticipated demand of torch systems for Solena Projects is included in Exhibit "A" for indicative reference.

1.2.2   In consideration for Solena treating Europlasma as its Preferred Provider of torch systems and its commitment to purchase all torch systems from Europlasma, Europlasma will provide discounted pricing for the purchase of multiple torch systems, as shown in the attached Exhibit "A" ("Multiple Torch Sale Pricing and Scope of Supply"). It is agreed that this Agreement does not create exclusivity from Europlasma to Solena and that Europlasma is free to market and sell its products and services to any third parties, excepted when explicitly specified otherwise in the Agreement.

1.2.3   As strategic partners, both parties commit to keep confidential information regarding Solena Technology and Europlasma Vitrification Technology. Europlasma will have access to Solena Technology and commits not to use any of Solena's information in its gasification processes or research programs,

- 2 -

neither in the potential benefit of any other plasma torch users and / or plasma gasification supplier.

1.2.4   As a strategic customer of Europlasma, Solena will have access to Europlasma Technology and confidential proprietary information. Therefore, Solena will not provide or sell Solena Technology for projects involving melting and vitrification of inorganic wastes without fuel gas to energy recovery and production, which are in competition with Europlasma.

## 1.3   "FEED" Support

1.3.1   Once a Solena Project enters into the FEED phase, and Solena requires the support of Europlasma, Solena and Europlasma will enter into a FEED Support Services Request ("FSSR") contract for that Solena Project.

1.3.2   The expected scope of services to be requested from Europlasma during the FEED phase of a Solena Project may include, but not be limited to, the following services:

- o   Assistance to selection and specification of the plasma torch system to be used

- o   Assistance to optimization of the integration of the plasma torch system into the overall reactor design

- o   Assistance to optimization of the integration of the plasma torch control system into the reactor control system

- o   Assistance to development and optimization of the different operating modes of the plasma torch system for the specific reactor design

- o   Practical tests on the plasma torches to determine the velocity of the plasma jet at different distances from the exit nozzle, as well temperature and pressure gradient in the plasma jet, and other operating conditions.

1.3.3   Europlasma will receive payment for the FEED Support Services. The guidelines for pricing of the FSSR are shown in Exhibit "B", Section 1.

1.3.4   For each project for which the parties sign a FSSR, Europlasma agrees to make available its resources such as design and testing facilities, engineering know-how and other resources as are necessary to develop, design or implement the Project.

1.3.5   The Parties agree that the payment for the FSSR will be deducted from the first payment corresponding to the first Sale Purchase Agreement for a torch system to be signed between Solena and Europlasma. The Parties agree that those deductions are not cumulative. One payment for one FSSR will be

deducted to one Sale Purchase Agreement. If there are two or more FSSR contracts, they will not be deducted to one Sale Purchase Agreement.

### 1.4    Technical Assistance Services

1.4.1    Technical Assistance Services (or "TAS") shall be defined as those technical evaluations, consulting, and other services that Europlasma shall provide to Solena when requested on a case by case basis, outside the scope of any Sales Purchase Agreement and / or FEED Support Services.

1.4.2    Solena may request TAS from Europlasma, subject to mutual agreement on the scope of the TAS, as well as written commitment from Europlasma not to provide similar engineering and technical services to any plasma gasification supplier, each time Solena considers that such TAS requires the provision of specific Confidential Information, as defined in the Reciprocal Confidentiality and Non-Compete/Non-Circumvention Agreement attached herein as Exhibit D of this Agreement, from Solena to Europlasma.

1.4.3    The general scope of assistance to be covered by Europlasma's TAS may include, but will not be limited to:

- o    Review and advice on the general design of the bottom section of the gasifier.

- o    Review and advice on the design of the slag tapping and slag exit.

- o    Advise on the optimization of the control system for the torches.

- o    Advice and recommendation of the different industrial sub-contractors and laboratories that Solena may employ for its Projects.

1.4.4    The mechanism through which Europlasma's TAS will be engaged by Solena shall follow these guidelines:

- o    Solena shall submit a request for Europlasma's Technical Assistance Services ("Request for TAS"), specifying the nature and scope of the services required.

- o    Europlasma will respond within three (3) weeks of receiving the Request for TAS, with a Preliminary Offer for its technical services, specifying the time and resources required to fulfill Solena's Request for TAS.

- o    Solena and Europlasma shall agree, within two (2) weeks of Europlasma's issue of the Preliminary Offer on the definitive scope of services and resources to be employed.

   o Solena and Europlasma shall subsequently sign a TAS Order to Proceed.

1.4.5 The price and form of payment for each TAS requested and ordered shall follow the terms and conditions per resource as specified in Exhibit "B" Section 2 of this Agreement

1.4.6 For each project for which the parties sign a TAS Order to Proceed, Europlasma commits to make available its resources such as design and testing facilities, engineering know-how and other resources as are necessary to develop, design or implement the TAS.

1.5 This Agreement is not intended by the Parties to constitute or create a joint venture, pooling arrangement, partnership, or formal business organization of any kind. The Parties shall be independent contractors and the rights and obligations of the Parties shall only be those expressly set forth herein. Neither party shall have the authority to bind the other except to the extent authorized herein, and nothing in this Agreement shall be construed as providing for the sharing of profits or losses arising out of the efforts of either or both Parties.

## 2. SOLENA TECHNOLOGY

2.1 The "Solena Technology" as "SPGV Technology" referred to in this Agreement shall mean the patents and systems referred to in the first paragraph of the Recitals, all of which are patented and/or trademarked, and are exclusively licensed to and owned by Solena; and such other proprietary knowledge regarding plasma gasification processes for various organic material feedstocks, including municipal waste, whether patented, under patent application or not, whereby organic feedstocks and materials are simultaneously gasified and vitrified under proprietary plasma gasification conditions into a stable fuel gas for energy production and an inert slag-rock.

2.2 Europlasma acknowledges and agrees that: (i) Solena's Technology and IPGCC systems, described and referred to herein, and any improvements made thereto at anytime by Solena, Europlasma, third parties or Project Customers in the course of the development, design, engineering, construction, commissioning or operation of a Project; (ii) any and all trademarks, designs, copyrights and industrial or commercial property rights in the SPGV Technology, IPGCC systems or all other relevant Solena Technology; and (iii) any and all products, parts, covers, names, marks, emblems, labels, information and materials pertaining to the SPGV Technology, IPGCC systems and all other relevant Solena Technology, are proprietary to Solena and that nothing done under this Agreement between Europlasma and Solena or other third parties shall provide Europlasma with any proprietary interest whatsoever in SPGV Technology, IPGCC systems or all other relevant Solena Technology.

- 5 -

3. **EUROPLASMA     TORCH     TECHNOLOGY     AND     EUROPLASMA TECHNOLOGY**

3.1 The "Europlasma Torch Technology" and "Europlasma Technology" referred to in this Agreement shall mean patents and rights owned or licensed to Europlasma as listed in Exhibit "C".

3.2 Solena acknowledges and agrees that: (i) Europlasma Torch Technology and Europlasma Technology, described and referred to herein, and any improvements made thereto at anytime by Europlasma, Solena, third parties or Project Customers in the course of the development, design, engineering, construction, commissioning or operation of a Project; (ii) any and all trademarks, designs, copyrights and industrial or commercial property rights in the Europlasma Torch Technology and Europlasma Technology; and (iii) any and all products, parts, covers, names, marks, emblems, labels, information and materials pertaining to the Europlasma Torch Technology and Europlasma Technology, are proprietary to Europlasma and that nothing done under this Agreement between Solena and Europlasma or other third parties shall provide Solena with any proprietary interest whatsoever in Europlasma Torch Technology and Europlasma Technology.

4. **CONFIDENTIALITY**

4.1 In preparation for the Parties' sharing of proprietary information in accordance with the terms of this Agreement, the Parties shall execute, commensurate with this Agreement, a Reciprocal Confidentiality and Non-Compete/Non-Circumvention Agreement (the "Confidentiality Agreement"), attached hereto and incorporated herein as Exhibit "D".

4.2 The Parties will be governed by the terms and conditions of the Confidentiality Agreement and the terms and conditions set forth therein shall survive the termination of this Agreement.

5. **TERM AND TERMINATION**

5.1 This Agreement shall have a term of three (3) years from the date first above written, which term may be renewed or extended by agreement of the Parties.

5.2 Either Party may terminate this Agreement if the other Party is in default of any of its material obligations hereunder or if either Party becomes insolvent, or files a petition or reorganization, composition or compromise with its creditors under any applicable national, federal or state law.  Upon the occurrence of any of the foregoing, the non-defaulting Party shall notify the other Party, in writing, of the

- 6 -

nature of the default and of the non-defaulting Party's intention to terminate the Agreement for default.

5.3 The non-defaulting Party may terminate this Agreement immediately if the defaulting Party becomes insolvent or files a petition for reorganization, composition or compromise with its creditors under any applicable national, federal or state law. Termination under this Paragraph 5.3 shall be deemed effective upon the giving of notice as provided herein.

5.4 For all defaults not otherwise contained in Paragraph 5.2, the non-defaulting Party may terminate this Agreement upon the expiration of thirty (30) days from the giving of notification of default if during that time the defaulting Party (i) failed to provide reasonable evidence that such default does not in fact exist, and (ii) did not commence and diligently pursue cure of such default.

5.5 This Agreement may be terminated by the mutual, written consent of the Parties.

5.6 Termination of this Agreement will also terminate all other commercial commitments and obligations of Solena under this Agreement but shall not affect the obligations taken upon a particular Sale Purchase Agreement for Plasma Heating Systems which has been executed prior to the termination of this Agreement.

5.7 The provisions of the Confidentiality Agreement (Exhibit "D") shall survive the termination of this Agreement, as per the terms and conditions set forth therein.


## 6. APPLICABLE LAW AND RESOLUTION OF DISPUTES

6.1 This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, United States of America, without regard to its conflict of laws, which for purposes herein shall be deemed as "Applicable Law".

6.2 If the event of a controversy, claim or dispute arising out of or relating to this Agreement, the representatives of the Parties shall meet and confer in good faith negotiations with the object of reaching mutual agreement and a settlement. If the Parties' representatives are unable to agree, such representatives shall promptly commence discussion with respect to resolving the dispute through non-binding alternative dispute resolution ("ADR") procedures fashioned by the representative themselves or with the assistance of persons or organizations experienced in ADR procedures such as the International Chamber of Commerce.

6.3 Any controversy, claim or dispute arising out of or relating to this Agreement, or the breach thereof, that the Parties can not amicably resolve under the procedures in Article 6.2, shall be settled by arbitration administered by the International Chamber of Commerce under its Commercial Arbitration Rules using an arbitrator that both Parties consent to in writing, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The place of

arbitration shall be London, England and the arbitrator shall determine the matters in dispute in accordance with Applicable Law. The Parties agree that the award of the arbitrator shall be binding and shall be the sole and exclusive remedy among them regarding claims, counterclaims, issues or accountings presented to the arbitrator.

## 7. INJUNCTIVE RELIEF

7.1  Notwithstanding any other provisions of this Agreement pertaining to the resolution of disputes, the Parties hereto agree that any breach or threatened breach of the confidentiality and non-circumvention provisions described in Paragraph 4 herein, and set forth in Exhibit "B" hereto, shall cause irreparable harm for which there is no adequate remedy at law, in damages or otherwise, as a result of which the Parties hereby consent to service of process and the issuance by any court of competent jurisdiction of an injunction, restraining the breach of such provision and the prohibited acts. The Parties hereby agree to be bound by the decision of such a court, and hereby consent to the enforcement of any such decision.

## 8. ASSIGNMENT

8.1  This Agreement shall not be assigned or otherwise transferred by either Party without the prior written approval of the other Party.

## 9. CONSEQUENTIAL DAMAGES

9.1  Neither Party will be liable to the other Party for indirect or consequential damages, including but not limited to lost profit or lost business opportunity, arising out of or related to this Agreement.

## 10. ENTIRE AGREEMENT

10.1 This Agreement constitutes the entire agreement between the Parties, relating to the subject matter hereof, and supersedes any previous agreements or understandings between them, whether oral or written.

## 11. AMENDMENTS

11.1 No amendments or additions to this Agreement shall be binding unless such amendments or additions are in writing and signed by the Parties.

- 8 -

## 12. NOTICES

**12.1** Any notices provided for or required shall be given in writing and sent via air mail, transmitted by facsimile, electronic mail or personally delivered to the following:

Solena:                Dr. Robert T. Do
President and CEO
Solena Group, Inc.
1900 K Street, N.W., Suite 626
Washington, D.C. 20004
Telephone: (+1 - 202) 682-2405
Facsimile: (+1 - 202) 682-1843
E-mail: RTDo@SolenaGroup.com

Europlasma:      Mr. Marc Lefour
Chief Operating Officer
Europlasma, S.A.
6, rue Lajaunie
33000 Bordeaux - France
Telephone: (+33 -55) 649 7015
Facsimile: (+33 -55) 649 7019
E-mail: mlefour@europlasma.com

or to such other persons or addresses as either of the Parties shall substitute by notice to the other party as herein required, and any such notice or communication given shall be deemed given as of the date mailed or transmission sent.

IN WITNESS THEREOF, the Parties acknowledge that they are authorized to enter and have entered into this Agreement as of the date first written above.

Solena Group, Inc                       Europlasma S.A.

By: _____    By : _____
Robert Do                         Marc Lefour
President and Chief Executive Officer    Chief Operating Officer

Date: __5/25/07__        Date: __31/05/2007__

- 9 -

**Exhibit "A"**
**"Multiple Torch Sale Pricing"**

ANTICIPATED TORCH SYSTEM DEMAND BY SOLENA

Most Solena IPGCC reactors include 3 torch systems with 1 spare torch body

Most Solena systems will use:
     (a) Type D: the 2 MW torch with 0.8 to 2.0 MW power supply
     (b) Type C: the 0.8 MW torch with 0.3 to 0.8 MW power supply

The following is the anticipated demand of torch systems by Solena per year. The year indicated is the year the order would be placed. Delivery time should be from 7 to 10 months average after order. Nevertheless, the estimated planning will be submitted together with the Sale Purchase Agreement and will depend on the complexity of the asked plasma system and the number of plasma torches.


<u>2007</u>
- 2 systems of 0.8 MW (3 torches plus 1 spare, per system)
- 1 system of 2 MW (3 torches plus 1 spare, per system)

<u>2008</u>
- 1 system of 0.8 MW (3 torches plus 1 spare, per system)
- 6 systems of 2 MW (3 torches plus 1 spare, per system)

<u>2009</u>
- 2 systems of 0.8 MW (3 torches plus 1 spare, per system)
- 6 systems of 2 MW (3 torches plus 1 spare, per system)


STANDARD SCOPE OF SUPPLY

EUROPLASMA supplies the following indicative scope of supply:

- Plasma Torch;
- Control System Unit;
- Plasma Power Supply;
- Hydraulic Unit;
- Cooling Water Module;
- Air Module;
- Cables and Hoses (length 40 meters);
- Accessories for Maintenance;
- Accessories and Special Tools;
- Standby Plasma Torch;
- Commissioning.

REFERENCE PRICES:

| 1 system of 2 MW (3 torches + 1 spare) | € 3.372.000,00 |
|---|---|
| 1 system of 0,8 MW (3 torches + 1 spare) | € 2.441.000,00 |

Prices are EXW incoterm and without VAT, local tax and import duties.

| Number of system ordered during the last six months before firm order date | Discount applied on reference price |
|---|---|
| 0 | 0% |
| 1 | 5% |
| 2 | 9% |
| 3 | 12% |

Every year, the following formula will be calculated on the reference price:

$$PV_N = ((PV_{N-1} \times 20\%) \times \Delta_1) + ((PV_{N-1} \times 10\%) \times \Delta_2) + PV_{N-1}$$

Where:
- $PV_N$ = Sale price from the present year;
- $PV_{N-1}$ = Sale price from last year;
- $\Delta_1$ = Fluctuation on the copper price and on the nickel price, indicated by the EURONEXT index;
- $\Delta_2$ = Fluctuation on the engineering price indicated by the SYNTEC index.

**Exhibit "B"**
**PRICING GUIDELINES FOR FEED SUPPORT SERVICES**
**AND TECHNICAL ASSITANCE SERVICES**

### Section 1: FEED Support Services

A FEED Support Service will be valued at € 50.000,00. This price will be updated annually, multiplying the previous year's price by (1 + French Consumer Price Index). The reference French Consumer Price Index for each update shall be the official French Consumer Price Index for the previous year.

The price for the FEED Support Service shall be paid 30 % upon order and 70 % upon execution of the FSSR.

The total amount for the FEED Support Service shall be deducted from the price given in the subsequent Sale Purchase Agreement.

Prices are without VAT, local tax and import duties.

### Section 2: Technical Assistance Services

Price per day of Qualified Engineers: € 1.250,00.

Prices are without VAT, local tax and import duties.

## Exhibit "C"
## "Europlasma Technology"

| Invention n° | Publication n° | Title | COUNTRIES | |
|---|---|---|---|---|
| 89 14677 | FR 2 654 294 (pdf) US 5 210 392 (pdf) | *Plasma Torch Initiated By Short Circuit* | DE, GB, NL, IT, SU, CH, ES, FR, JP, Canada, Corée, USA | |
| 87 00078 | FR 2 609 358 (pdf) US 54 847 466 (pdf) | *Plasma torch having a longitudinally mobile arc root, and process for controlling the displacement thereof* | FR | |
| 95 07790 | FR 2 735 940 (pdf) US 5 695 664 (pdf) | *Plasma torch with a substantially axi-symmetrical general structure* | FR, USA, Canada, Japon (en cours) | |
| 97 05921 | FR 2 763 466   - US 6 00 84 64 (pdf) | *System for regulating and controlling plasma torch* | FR | |
| 98 07048 | FR 2 779 316 (pdf) | *Device for mixing cold gas at the output of a plasma torch.* | FR | |
| 87 00726 | FR 2 610 087 (pdf) US 4 831 944 (pdf) | *Process and device for destroying solid waste by Pyrolysis* | FR, ES, IT, JP | |
| 98 932220.1 | WO98/58882   - FR 2 764 877   - US 6 532 768 (pdf) | *Method Of Rendering Inert, With The Aid Of A Plasma Torch, Products Containing Metals, In Particular Heavy Metals, And Facility For Carrying Out Said Method* | FR, DE, at, GB, IE, BE, NL, LU, IT , ES, CH, MC, US, CA, BR, TW, SG, ZA, AU, JP, Corée, USA | |
| 98 16 643 | FR2788097   (pdf) | *Furnace For Melting Solid Waste With Cooling Water Boxes* | FR, QT, JP, USA, ES | |
| 98 16 642 | FR2788121   (pdf) | *Closure Valve For Waste Gas Chamber* | FR, QT, JP, USA, ES, | |

| 98 16644 | FR2788122   (pdf) | *Furnace for fusion of solid wastes, comprises nozzle fitted to flow orifice* | FR | |
| | WO95/04004   (pdf) FR 2 708 217   (pdf) EP 0711 254B1 | *Method Of Rendering Inert, With The Aid Of A Plasma Torch, Products Containing Metals, In Particular Heavy Metals, And Facility For Carrying Out Said Method* | FR | |
| 05 53 128 | FR0553128 | *Apparatus for the gasification of biomass or organic waste under high temperature and* | FR | PCT en cours |

- 13 -

| | | input of an external energy for generating a high quality syngas | | |
|---|---|---|---|---|
| 06 55 217 | FR15915 | *Apparatus and Method of rendering Inert, by plasma melting hazardous materials* | En cours de dépôt FR JP | |

**Exhibit "D"**
### RECIPROCAL CONFIDENTIALITY AND
### NON-DISCLOSURE/NON-CIRCUMVENTION AGREEMENT

This Reciprocal Confidentiality and Non-Disclosure / Non-Circumvention Agreement (hereinafter "Confidentiality Agreement") is made on the 29th of May,2007 by and between Solena Group ("Solena") a Delaware Corporation, and Europlasma or "Europlasma") with its principal offices located at Morcenx, France, referred to individually as "Party", or collectively as "Parties".

WHEREAS, The Parties agree to enter into a confidential business relationship for the purpose of discussing and negotiating a more extensive business relationship.

WHEREAS, In order to achieve this purpose the Parties desire to enter into this Confidentiality Agreement.

NOW THEREFORE, In consideration for the foregoing and mutual covenants contained herein, the Parties agree:

## 1.  SCOPE OF RELATIONSHIP

1.1  The Party that receives any information ("Receiving Party") in tangible form from the Party disclosing that information ("Disclosing Party"), that is marked Confidential or Proprietary ("Confidential Information"), will consider and treat that that information as confidential. Oral information will be considered Confidential Information if it is identified as confidential by the Disclosing Party at the time of disclosure and reduced to writing and sent to the Receiving Party, under the proper notice procedures defined by this Confidentiality Agreement in Article 8, within 30 days of the disclosure.

1.2  The Receiving Party agrees to maintain all Confidential Information in the strictest confidence using at least reasonable care and except as provided by this Confidentiality Agreement, shall not use Confidential Information for its own benefit or disclose it to third parties without the written consent of the disclosing party.

1.3  Upon request from the Disclosing Party, the Receiving Party shall return within thirty (30) days all tangible materials made available or supplied by the Disclosing Party including, but not limited to, all drawings, documents, hardware, discs and tapes, without retaining any copies, notes or extracts.

1.4  Neither Party shall have any obligation under this Confidentiality Agreement with respect to information which:

A. which is now public information or which becomes public information through no fault of the Receiving Party;

- 15 -

**B.** which is properly provided to the Receiving Party without restriction by a third party, which has the legal right to do so;

**C.** which the Receiving Party can show was previously in its possession or known at the time of receipt from the Disclosing Party; or

**D.** which is developed by the Receiving Party without breach of this Confidentiality Agreement.

1.5 This Confidentiality Agreement does not obligate either Party to disclose any information to the other Party or enter into any other agreement or arrangement nor shall it be construed as granting any rights by license or otherwise in any software or inventions of either party. The Parties' agree to act in good faith in discussing and negotiating a more extensive business relationship.

1.6 The Parties agree not to circumvent each other by entering into negotiations with other identified third parties regarding specific projects disclosed during this Confidentiality Agreement for a period of at least three (3) years after the termination of this Confidentiality Agreement.

1.7 The Confidential Information that Solena shall supply to Receiving Party includes Solena Technology which is defined as patent number 5544597 (Plasma pyrolysis and vitrification of municipal solid waste), issued on August 13, 1996 by the U.S. Patent and Trademark Office, the patent number 5634414 (Process for Plasma pyrolysis and Vitrification of municipal solid waste), issued on June 3, 1997 by the U.S. Patent and Trademark Office, the patent number 1419220 B1 (Plasma Pyrolysis, Gasification and Vitrification of organic material), issued on October 07, 2005 by the European Patent Office and the patent number 6987792 B2 (Plasma Pyrolysis, Gasification and Vitrification of organic material) issued on January 17, 2006 by the U.S. Patent and Trademark Office(hereinafter collectively "Patents"); and other proprietary knowledge whether or not patented regarding plasma waste treatment processes for various waste streams whereby waste streams are simultaneously pyrolyzed and vitrified under plasma heating conditions into a fuel gas and an inert slag, together with its trademarked Integrated Plasma Gasification Combined Cycle ("IPGCC") (collectively referred to herein as the "Solena Technology"). The Solena Technology and any and all improvements or modifications thereto is and shall remain the sole property of Solena. Nothing contained in this Confidentiality Agreement shall, by express grant, implication, estoppel or otherwise, create in the Receiving Party any right, title, interest or license in or to Solena's inventions, patents, technical data, technical documentation or the Solena Technology.

1.8 The Confidential Information that Europlasma shall supply to Solena includes Europlasma Technology which is defined as per exhibit C; and other proprietary knowledge whether or not patented regarding plasma waste treatment processes,

- 16 -

plasma high temperature refractory and furnace knowledge, plasma torches electrodes enhancements, industrial knowledge of vitrification plants and processes, proper furnace and plasma torch coupling. The Europlasma Technology and any and all improvements or modifications thereto is and shall remain the sole property of Europlasma. Nothing contained in this Confidentiality Agreement shall, by express grant, implication, estoppel or otherwise, create in the Receiving Party any right, title, interest or license in or to Europlasma's inventions, patents, technical data, technical documentation or the Europlasma Technology.

## 2.  TERM OF CONFIDENTIALITY AGREEMENT

2.1  This Confidentiality Agreement is for a term of three (3) years from the date above.

2.2  This Confidentiality Agreement may be terminated by written mutual consent by both Parties.

2.3  The provisions of Article 1 shall survive any termination of this Confidentiality Agreement, except for those specific provisions where explicit term periods are provided for.

## 3.  RESOLUTION OF DISPUTES / ARBITRATION

3.1  All claims, disputes and other matters in question between the parties arising out of or relating to this Confidentiality Agreement or the breach thereof, shall be settled, if possible, by negotiation and mutual agreement of the Parties thereto.

3.2  Each Party hereto shall give notice promptly to the other of the claim, dispute or other matter in question arising out of or relating to this Confidentiality Agreement or that breach thereof. Within fifteen (15) calendar days following such notice, the Parties' representatives shall conduct good faith negotiations with the object of reaching mutual agreement. Thereafter, if the Parties are unable to agree, then each of the Parties shall document their respective position on the claim, dispute or other matter within thirty (30) calendar days and deliver to the other's representative a written presentation, setting forth in reasonable detail the Party's entitlement or relief or position thereof. Upon receipt of written presentations and within thirty (30) calendar days thereafter, the representatives of the Party shall meet and confer in good faith negotiations with the object of reaching mutual agreement and settlement.

3.3  If the representatives of the Parties are unable to agree, such representatives shall promptly commence discussions with respect to resolving the dispute through any non-binding alternative dispute resolution (ADR) procedure fashioned by the representatives themselves or with the assistance of persons or organizations experienced in ADR procedures, such as the International Chamber of Commerce. The location of the ADR shall be in London, England unless otherwise jointly agreed by the parties.

- 17 -

3.4   If the Parties are unable to agree on an ADR procedure to be used, the claim, dispute or other matter in question between the parties, arising out of or relating to the Confidentiality Agreement, shall be decided by a court of competent jurisdiction in the State of Delaware, USA.

3.5   Regardless of the legal remedies available to the injured Party, the breaching party acknowledges that the injured party has suffered irreparable harm and is entitled to injunctive relief preventing further injury. This injunctive relief does not limit any other legal remedies available to the injured party.


4.   **GOVERNING LAW**

4.1   This Confidentiality Agreement shall be interpreted under and governed by the laws of the State of Delaware, USA.


5.   **ENFORCEABILITY**

5.1   In the event any provision of this Confidentiality Agreement is found to be unenforceable or invalid, such provision shall be severable from this Confidentiality Agreement if it is capable of being identified with and apportioned or reciprocal consideration or to the extent that it is a provision which is not essential in the absence of which would not have prevented the Parties from entering into this Confidentiality Agreement. The unenforceability or invalidity of a provision which has been performed shall not be grounds for invalidation of the Confidentiality Agreement under circumstances in which the true controversy between the parties does not involve such provision.

6.   **AMENDMENTS**

6.1   No amendments or additions to this Confidentiality Agreement shall be binding unless such amendments or additions are in writing and signed by the Parties.

7.   **HEADINGS**

7.1   The paragraph and section headings in this Confidentiality Agreement are included solely for convenience and shall not affect, or be used to in connection with, the interpretation of this Confidentiality Agreement.

8.   **NOTICES**

8.1   Any notices provided for or required shall be given in writing by either prepaid first class mail or certified mail, return receipt requested to the following:

- 18 -

Solena Group, Inc.
ATTN: Dr. Robert T. Do, President and CEO
1900 K Street, N.W.
Suite 626
Washington, D.C. 20004
United States of America
Tel: (+1 - 202) 682-2405
Fax:(+1 - 202) 682-1843


Europlasma, S.A.
ATTN: Marc Lefour, COO
6, rue Lajaunie
33100 Bordeaux - France
Tel: (+33 -55) 649 7015
Fax: (+33 -55) 649 7019


or to such other persons or addresses as either of the Parties shall substitute by notice given as herein required, and any such notice or communication shall be deemed given as of the date mailed.

In witness whereof, the parties have executed this Confidentiality Agreement as of the date first written above.

SIGNED by: Dr. Robert T. Do
Title: President and CEO
Solena Group, Inc.

Signed

SIGNED by: Marc Lefour
Title: Chief Operating Officer
Europlasma, S.A.

Signed:

- 19 -

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EUROPLASMA, S.A.,                           )
                                            )
       Plaintiff,                        )
                                            )
      v.                                )     Case No. 1:08-CV-01089 HHK
                                            )
SOLENA GROUP, INC.,                         )
                                            )
       Defendants.                       )

**AFFIDAVIT OF JAMES M. MESNARD**

     James M. Mesnard, being duly sworn, and based upon personal knowledge, deposes and

says:

     1.     I am an attorney at the Washington, D.C. office of Seyfarth Shaw LLP.

     2.     I am one of the counsel for Solena Group, Inc. ("Solena") in this action.

     3.     Plaintiff Europlasma, S.A. ("Europlasma") initiated this action on approximately

June 24, 2008.

     4.     Solena has not answered Europlasma's Complaint because it has moved to

dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

     5.     No discovery has taken place in this action.

     6.     Europlasma has moved for summary judgment asserting that a note Solena

executed on September 14, 2007 ("Note") is not subject to a Master Teaming Agreement

("Agreement") the parties entered into on approximately May 29, 2007.

     7.     Pursuant to Rule 56(f), Solena has moved that Europlasma's summary judgment

motion be denied so that Solena may conduct discovery concerning the scope of the Agreement.

     8.     The express language of the Agreement, a February 14, 2008 e-mail from

Europlasma to Solena (Exhibit B to Joanne Zimolzak's Affidavit) and Solena's March 13, 2008

letter to Europlasma (Exhibit C to Joanne Zimolzak's Affidavit) establish that this dispute arises out of or relates to the Agreement and, therefore, that the parties agreed to be bound by the mandatory ADR provision of the Agreement. Europlasma asserts that this dispute does not in any way relate to the Agreement.

9.     Solena should be afforded an opportunity to conduct the normal discovery available in a civil action. Among other things, Solena should be permitted to propound interrogatories to discover Europlasma's internal and external communications concerning the scope and applicability of the Agreement.

10.     Solena should be afforded an opportunity to propound requests for production to obtain copies of Europlasma's internal and external e-mails, correspondence and other writings concerning the scope and applicability of the Agreement.

11.     Solena should also be afforded an opportunity to depose individuals identified in Europlasma's discovery responses. At a minimum, Solena expects that this would include Andre-Jean Goimand. In his February 14, 2008 e-mail to Yves Barrel and Robert Do at Solena, Mr. Goimand stated that, because of the dispute, Europlasma would not be able to conduct business with Solena until this dispute is resolved.

12.     Solena asserts that this e-mail establishes that the current dispute arises out of, or at least relates to, the Agreement and, therefore, that the mandatory arbitration provision applies to this dispute.

2

13.    Solena should be allowed to depose Mr. Goimand to explore the reasoning for his statements.

I declare, under penalty of perjury, and based on first hand knowledge, that the foregoing is true to the best of my knowledge and belief.

August 26, 2008

James M. Mesnard

Subscribed and sworn to before me this 26th day of August, 2008.

Notary Public
Vanessa S. Hayward
Notary Public, District of Columbia
My Commission Expires 10/31/2012

My Commission expires: _____

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| EUROPLASMA, S.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-CV-01089 HHK |
| | ) | |
| SOLENA GROUP, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Upon consideration of the motion for summary judgment submitted by Plaintiff

Europlasma, S.A., Inc., and the supporting and opposing statements of points and authorities, it

is hereby ordered, this _____ day of _____, 2008 that Plaintiff's Motion is

DENIED.


_____
Henry H. Kennedy
United States District Judge